[No. F046939. Fifth Dist. May 25, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL JOHNSON, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of the Discussion.

1138

COUNSEL

Robert D. Bacon, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, J. Robert Jibson, Judy

Kaida and Michael Chamberlain, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ARDAIZ, P. J.**—Appellant Michael Johnson stands convicted, following a jury trial, of two counts of forcible oral copulation (Pen. Code,[1] § 288a, subd. (c)(2); counts 1–2) and one count of forcible rape (§ 261, subd. (a)(2); count 3), all of which involved kidnapping the victim for the purpose of committing the sexual offense (§ 667.8, subd. (a)) and the use of a knife in commission of the offense (§ 12022.3, subd. (a)). Following a bifurcated court trial, appellant was further found to be a habitual sex offender (§ 667.71); to have committed sexual offenses under aggravated circumstances (§ 667.61, subds. (a), (d)); to have suffered three prior serious felony convictions (§ 667, subd. (a)(1)) that were also strikes (§ 1170.12); and to have served two prior prison terms (§ 667.5, subd. (b)). In addition, the court found that the statute of limitations had been extended (§ 803, former subd. (i) [see now, subd. (g)]). Appellant was sentenced to determinate and indeterminate terms that totaled 256 years to life in prison.

On appeal, appellant challenges admission of DNA evidence and various portions of his sentence. In the published portion of this opinion, we hold that a "cold hit" from a DNA database is not subject to the *Kelly-Frye*[2] standard of admissibility, at least when, as here, it is used merely to identify a possible suspect. We further hold that there was no unlawful search or seizure. In the unpublished portion of our opinion, we reverse the findings under sections 667.61, subdivision (d)(1) and 667.71, and remand the matter for further proceedings.

## FACTS

Around 9:45 p.m. on February 18, 1996, 15-year-old G.N. was abducted at knifepoint while using a pay telephone to talk to her boyfriend. Her assailant

---

[1] All statutory references are to the Penal Code unless otherwise stated.

[2] *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*); *Frye v. United States* (D.C. Cir. 1923) 54 App.D.C. 46 [293 Fed.1013] (*Frye*).

Although the federal *Frye* analysis has been superseded by adoption of the Federal Rules of Evidence (28 U.S.C.) (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587 [125 L.Ed.2d 469, 113 S.Ct. 2786]), the California Supreme Court has reaffirmed the *Kelly-Frye* test in this state (*People v. Leahy* (1994) 8 Cal.4th 587, 612 [34 Cal.Rptr.2d 663, 882 P.2d 321]). While it is now referred to as the *Kelly* test (*ibid.; People v. Soto* (1999) 21 Cal.4th 512, 515, fn. 3 [88 Cal.Rptr.2d 34, 981 P.2d 958]), we shall occasionally use the *Kelly-Frye* designation for consistency with prior case law (see *People v. Mitchell* (2003) 110 Cal.App.4th 772, 782, fn. 1 [2 Cal.Rptr.3d 49]).

threatened to stab her if she said anything, then walked her to a pickup truck and had her crouch down on the floorboard while he drove her to a rural area. When she tried to raise up to see where they were going, he struck her on the head and threatened to stab her. Once they reached their destination, which G.N. believed was a field, the man had her orally copulate him. They then got out of the truck, and the man had G.N. remove her clothes and orally copulate him again. He had her lie on the seat of the truck, then he masturbated, got on top of her and pulled her legs apart, and raped her. He then asked G.N. how old she was. When she replied that she was 15, he got off of her and said he had a daughter her age and would not like something like this to happen to his daughter. G.N. then put her clothes back on and again sat on the floorboard of the truck. The man dropped her off back in town, and told her that she was lucky she bumped into him and not someone else who could have killed her. He spoke to her in a mixture of English and Spanish.

G.N. ran to her boyfriend's house. She was yelling and crying that somebody raped her. Her boyfriend summoned the police and an ambulance. A sexual assault examination was performed on G.N. around 12:30 the next morning. There was a swollen, bruised area above her left eye, and another swollen area on the side of her head, above the ear. There were no external genital injuries, but there was dirt on the vagina, and a loose hair and white liquid were found inside the vaginal vault. The physical findings were consistent with the history given by G.N.

G.N. described her assailant and the truck to Officer Willmore while she was still at the hospital. She described the truck as a 1970's or older Ford shortbed, red or maroon in color, and in poor condition. She said it ran loudly, was stock height, had wind-wing windows and a red interior, and had a manual transmission with the shift on the steering column. She also said there was a red rag or object tied around the steering column, and that the truck had a steel dashboard that was missing several pieces, including the radio and some knobs. She described her assailant as a Hispanic male, approximately 30 to 40 years old, six feet tall, 175 to 195 pounds, with brown eyes, and with short, black, slicked-back hair and a fu manchu mustache. She also described what he was wearing, and said he had numerous tattoos on his right arm, from the wrist all the way to the elbow, and possibly a tattoo of a web with something caught inside, on his inner left forearm.

The next day, Willmore had G.N. view a pickup, which she positively identified as that driven by her assailant. The truck, a 1969 Ford Ranger with a missing radio, was seized and impounded, but was subsequently released to its owner because he did not match the description of the suspect.[3] The police also showed G.N. 576 photographs of possible suspects, but she was unable to identify anyone.[4]

In September 1996, the case was inactivated because there were no new leads. On June 12, 2001, the sexual assault examination kit taken from G.N. was submitted to the Department of Justice Regional Laboratory. In November of that year, Criminalist Kay Strohl examined the evidence and detected sperm cells on one of the vaginal smear slides. This evidence, along with a reference blood sample from G.N., was then sent to the Department of Justice DNA Laboratory for further testing.

Department of Justice Senior Criminalist Maosheng Ma analyzed the evidence for DNA. She performed a differential extraction on one of the vaginal swabs, to separate the sperm cells from the victim's cells. She then amplified the DNA and obtained a DNA profile using 13 loci. As she did not have a suspect, she submitted the profile to the FBI's Combined DNA Index System (CODIS), which is a nationwide database. When she received information of a "hit" on appellant, who was in the database, she requested a reference sample from him.

Appellant was located at Corcoran State Prison, and his blood was drawn on December 12, 2003. Maosheng Ma analyzed the blood samples and confirmed that the DNA profiles matched. She then applied the product rule to determine the rarity of the profile to assess whether it was a real match or just coincidence because the profile was shared by more than one person. She determined that the profile obtained from the evidence item sperm fraction was estimated to occur at random in the general population in about one in 130 quadrillion African-Americans, one in 240 quadrillion Caucasians, and one in 4.3 quadrillion Hispanics.

Meanwhile, Detective Wright showed G.N. a photographic lineup that included appellant's photograph, but she did not identify anyone and stated

---

[3] The owner of the pickup was Robert Calkins, a Caucasian male then in his late 30's, with long hair and a full brown beard. The vehicle was registered to Javier or Cecilia Sixtos, Calkins having purchased the truck and not yet reregistered it. Although Sixtos resided in Visalia, where the abduction occurred, apparently no one investigated him or showed his photograph to G.N.

[4] Appellant's photograph was not contained in the police department's database at the time.

she could not remember.[5] Wright determined that appellant lived in Visalia in 1996, and that he had purchased a 1981 Chevrolet pickup in 1995. Appellant received a traffic citation with respect to that vehicle on March 7, 1996.[6] The vehicle was involved in a hit-and-run accident on April 1, 1997, and it was noted at the time that the stereo was missing from the dashboard. Wright did not attempt to locate the pickup because, according to Department of Motor Vehicles (DMV) records, it was scrapped in 1999. Appellant was 34 years old and had a 12-year-old daughter at the time G.N. was assaulted. He also had tattoos on his arms.[7]

## DISCUSSION

## I

## DNA EVIDENCE

A. Kelly

### 1. *Background*

Prior to trial, appellant moved to exclude the DNA evidence pursuant to Evidence Code sections 402 and 405. He also requested a *Kelly* hearing, contending the evidence was inadmissible under that rule and under Evidence Code section 352. The People opposed the motion, arguing in part that the polymerase chain reaction (PCR) and short tandem repeat (STR) methods of DNA analysis used in the present case had already been proven to be generally accepted in the relevant scientific community.

A hearing was held outside the jury's presence at which Maosheng Ma testified.[8] According to her, statistical interpretation is a large part of DNA

---

[5] G.N. was not asked to attempt an identification of appellant at trial.

[6] The parties stipulated that appellant owned and drove a 1981 Chevrolet C-10 pickup, described as red or maroon in color, in 1996.

[7] Photographs of the tattoos on appellant's arms were taken on February 27, 2003. The prosecutor described them as depicting tattoos from the wrist to the elbow of appellant's right arm, and, on his left arm, a spider web with a spider caught in it. The parties stipulated that appellant had these tattoos in 1996.

[8] Although Ma testified at length concerning the techniques she used in analyzing the DNA in the present case, her own qualifications, proficiency testing, and the like, we recite only those portions of her testimony that are relevant to the issues raised on appeal.

analysis because, when a match between an evidence sample and a reference sample is obtained, it is important to know how rare the match is. As Ma framed the question, "Is it [a] coincidental match or is it really the person who is the origin of that stain?" A database is used to determine the rarity of the genetic profile in the population. Here, she used the ethnic databases approved by the FBI.

In calculating rarity, Ma used the product rule. She explained the significance of Hardy-Weinberg equilibrium and linkage equalization, and testified that she relied on the National Research Council's book—the NRC II, a DNA analyst's "Bible"—that recommended use of the product rule in estimating rarity where, as here, 13 polymorphic loci were being examined. Ma further explained that the Department of Justice had a protocol on how to use the product rule, which she followed. Pursuant to that protocol, once a genetic profile is obtained from evidence, a search is made of the criminal offender database.[9] When there is a match—a "hit"—a request is made for a reference sample from the suspect. That sample is separately processed, and the profile thus obtained is then compared to the profile from the evidence sample. If there is a match, Ma then utilizes the FBI's population databases to find the frequency of that profile. She obtains a number, representing frequency, for each location, then multiplies all 13 together. That is the product rule, and it gives her the final statistical interpretation number. In obtaining this number, Ma uses a computer, but then also manually calculates the result and compares her answer with that of the computer. She followed these steps in this case, and determined that the evidence profile was estimated to occur at random, among unrelated individuals, in about one in 130 quadrillion African-Americans, one in 240 quadrillion Caucasians, and one in 4.3 quadrillion Hispanics. These figures represent an estimation of the rarity of the genetic profile in the population. According to Ma, use of the product rule is generally accepted within the scientific community.

At the conclusion of the hearing, the trial court found that Ma was an expert in DNA, that the type of testing used had previously been found to be generally accepted in the scientific community, and that Ma followed accepted scientific protocol. Accordingly, the court ruled that she could testify.

Ma's subsequent testimony before the jury contained no noteworthy differences from her testimony in the *Kelly* hearing. She did explain to the jury that the frequency estimate gives an idea of the rarity of the profile, saying, "If it is very rare, our instincts say must be the person. If it is so common, maybe there's somebody else who shares this profile. That is what this number

---

[9] Ma explained that the data bank group processes the offender samples by robot, not manually, because they process hundreds a day. At the time Ma performed her analysis in this case, there were more than 200,000 samples in the offender database.

means, really." She also explained that she determined profile frequency based on African-American, Caucasian, and Hispanic databases since, when she is not sure of the ethnic origin of the evidence profile, she uses those three common ethnic groups, which are the databases used by the FBI. In this case, she had no information concerning the race of the possible suspect. Ma also noted that, in dealing with statistical results in the quadrillions, removing a zero to be conservative would not matter, since the resulting number would still be much more than a billion.[10]

Appellant now says the trial court erred by admitting the DNA evidence. He argues that a "cold hit" DNA match (one where the suspect is first identified by a database search or "trawl") presents different statistical issues than a "confirmation" match (one in which a suspect has already been developed based on other information), and that because the instant case involved a cold hit, the foundation concerning the statistical interpretation of the DNA evidence was insufficient to satisfy the *Kelly* standard for scientific evidence.[11]

---

[10] Interestingly, Ma testified that only rarely will two profiles match at four or five loci. Here, there were 13 loci. Ma testified, on cross-examination:

"Q. You also—so we are clear on this, you also stated that it would be uncommon to have 13 matching alleles at those locus [*sic*]?

"A. And a different person.

"Q. And not being a different person?

"A. Never occurs.

"Q. Unless it's an exact twin?

"A. Yeah. Possibly." (Italics added.)

Recently, one appellate court, when confronted with a 13-loci match, stated: "We conclude that there exist methods of DNA analysis employing certain markers that, when tested along a minimum number of loci, yield DNA profiles with an astonishingly small random match probability. When the random match probability is sufficiently minuscule, the DNA profile may be deemed unique. In such circumstances, testimony of a match is admissible without accompanying contextual statistics. In place of the statistics, the expert may inform the jury of the meaning of the match by identifying the person whose profile matched the profile of the DNA evidence as the source of that evidence; *i.e.* the expert may testify that in the absence of identical twins, it can be concluded to a reasonable scientific certainty that the evidence sample and the defendant sample came from the same person. [Citation.] [¶] A defendant is not without recourse when the State's expert identifies the defendant as the source of the DNA evidence. The defendant has the opportunity, and the right, to challenge the expert's conclusion in cross-examination." (*Young v. State* (2005) 388 Md. 99 [879 A.2d 44, 56–57], fns. omitted.)

[11] Respondent preliminarily argues that appellant failed to challenge the statistical evidence at trial on the grounds now asserted, and so should be deemed to have forfeited the issue for purpose of appeal. (Evid. Code, § 353.) A failure to object at trial to the admission of evidence on grounds that it is irrelevant or inadmissible under *Kelly* forfeits such a claim for appeal. (E.g., *People v. Combs* (2004) 34 Cal.4th 821, 847 [22 Cal.Rptr.3d 61, 101 P.3d 1007] [relevance]; *People v. Ochoa* (1998) 19 Cal.4th 353, 414 [79 Cal.Rptr.2d 408, 966 P.2d 442] [*Kelly-Frye*].) The same holds true with respect to the improper use of statistical probability figures. (E.g., *People v. Pride* (1992) 3 Cal.4th 195, 242 [10 Cal.Rptr.2d 636, 833 P.2d 643]; *People v. Coleman* (1988) 46 Cal.3d 749, 776–777 [251 Cal.Rptr. 83, 759 P.2d 1260].) In light

### 2. *Analysis*

■ "A determination that the DNA profile of an evidentiary sample matches the profile of a suspect establishes that the two profiles are consistent" (*People v. Venegas* (1998) 18 Cal.4th 47, 82 [74 Cal.Rptr.2d 262, 954 P.2d 525]); hence, the suspect cannot be excluded as the source of the evidentiary sample. This determination is of little significance, however, "if the evidentiary profile also matche[s] that of many or most other human beings." (*Ibid.*) Thus, while the fact of a match itself is relevant because it means the suspect *could be* the perpetrator, the probability that he *is* the perpetrator depends on the frequency with which the genetic profile appears in the population of possible perpetrators, i.e., the rarity of the perpetrator's profile in the population. (*People v. Pizarro* (2003) 110 Cal.App.4th 530, 576 [3 Cal.Rptr.3d 21].)[12] The rarer the genetic profile, the more likely the suspect is the source of the evidentiary sample. (*Ibid.*) Thus, astronomical numbers, such as were presented in this case, are powerfully incriminating evidence. (*Ibid.*)

■ The computation step of DNA analysis falls "under the *Kelly/Frye* umbrella." (*People v. Venegas, supra,* 18 Cal.4th at p. 83; accord, *People v. Taylor* (1995) 33 Cal.App.4th 262, 266 [40 Cal.Rptr.2d 132]; *People v. Barney* (1992) 8 Cal.App.4th 798, 818 [10 Cal.Rptr.2d 731]; *People v. Axell* (1991) 235 Cal.App.3d 836, 866–867 [1 Cal.Rptr.2d 411].) *Kelly* "requires the proponent of expert testimony based on the application of a new scientific technique to satisfy three criteria: (1) the technique or method is sufficiently established to have gained general acceptance in its field; (2) testimony with respect to the technique and its application is offered by a properly qualified expert; and (3) correct scientific procedures have been used in the particular case. [Citations.]" (*People v. Wash* (1993) 6 Cal.4th 215, 242 [24 Cal.Rptr.2d 421, 861 P.2d 1107]; see *Kelly, supra,* 17 Cal.3d at p. 30; *People v. Brown* (2001) 91 Cal.App.4th 623, 626 [110 Cal.Rptr.2d 750].) The *Kelly* court was particularly concerned with jurors' perceived tendency "to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials," and "acknowledged the existence of a '. . . misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' [Citations.]" (*Kelly, supra,* at pp. 31–32.) The

---

of appellant's blanket challenge to the DNA evidence and his focus on statistical computations, the question here is a close one. We will assume the issue is cognizable and decide it on the merits to forestall appellant's alternative claim that trial counsel was ineffective if he failed adequately to preserve the issue. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1192 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Lewis* (1990) 50 Cal.3d 262, 282 [266 Cal.Rptr. 834, 786 P.2d 892]; *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 150–151 [15 Cal.Rptr.2d 167]; *People v. Yorba* (1989) 209 Cal.App.3d 1017, 1026 [257 Cal.Rptr. 641].)

[12] Although our analysis applies equally to female suspects and perpetrators, we use male pronouns in our discussion because G.N.'s attacker was male.

court found "[e]xercise of restraint . . . especially warranted when the identification technique is offered to identify the perpetrator of a crime. ' "When identification is chiefly founded upon an opinion which is derived from utilization of an unproven process or technique, the court must be particularly careful to scrutinize the general acceptance of the technique." ' [Citations.]" (*Id.* at p. 32.) The court recognized, however, that "once a trial court has admitted evidence based upon a new scientific technique, and that decision is affirmed on appeal by a published appellate decision, the precedent so established may control subsequent trials, at least until new evidence is presented reflecting a change in the attitude of the scientific community." (*Ibid.*)

■ Given the number of appellate opinions measuring different aspects of DNA analysis against the *Kelly* criteria, it is easy to overlook the prerequisite for applicability of those requirements. *Kelly* does not apply to every dispute among experts, even strident, deep-seated ones. Experts frequently clash, even about basic principles and issues. Such disagreement does not trigger application of the *Kelly* test; instead, what is required is the utilization of a new scientific technique. Indeed, *Kelly* is applicable *only* to such techniques. (*People v. Leahy, supra,* 8 Cal.4th at p. 605; *People v. Mitchell, supra,* 110 Cal.App.4th at p. 782.)

What constitutes a "new scientific technique" can be difficult to discern. As explained by the California Supreme Court in *People v. Stoll* (1989) 49 Cal.3d 1136, 1155–1156 [265 Cal.Rptr. 111, 783 P.2d 698], "Because the inventions and discoveries which could be considered 'scientific' have become virtually limitless in the years since *Frye* was decided, application of its principle has often been determined by reference to its narrow 'common sense' purpose, i.e., to protect the jury from techniques which, though 'new,' novel, or ' "experimental," ' convey a ' "misleading aura of certainty." ' [Citations.] [¶] This approach has produced two discernable themes. First, *Kelly/Frye* only applies to that limited class of expert testimony which is based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law. The courts are willing to forego admission of such techniques completely until reasonably certain that the pertinent scientific community no longer views them as experimental or of dubious validity. . . . [¶] The second theme in cases applying *Kelly/Frye* is that the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data. Lay minds might easily, but erroneously, assume that such procedures are objective and infallible. [Citations.]"

■ We have no doubt that the technique employed here—the search of a database to identify a potential suspect, followed by confirmatory DNA

analysis—qualifies as "scientific." Moreover, as we have noted, there are a number of appellate opinions that apply *Kelly* to DNA analysis. These courts' explicit or implicit determinations that *Kelly* applied, however, are not static; they represent analyses of the state of science, and state of the law, as of the time the cases were decided. "Science, like time, marches on" (*People v. Yorba, supra,* 209 Cal.App.3d at p. 1023), and the cases do not stand for the proposition that certain techniques or procedures are subject to *Kelly*'s foundational requirements whenever they arise, forevermore. Simply put, at this juncture the technique at issue here is not new to science or the law, novel, or experimental, appellant's insistence to the contrary notwithstanding.

PCR and STR methods of DNA analysis have been held to be generally accepted in the relevant scientific community for some time now. (See, e.g., *People v. Smith* (2003) 107 Cal.App.4th 646, 665 [132 Cal.Rptr.2d 230] [use of PCR and STR technology to analyze mixed-source forensic sample neither new nor novel technique or methodology]; *People v. Brown, supra,* 91 Cal.App.4th at p. 627, fn. 4 [PCR procedures accepted in scientific community]; *People v. Hill* (2001) 89 Cal.App.4th 48, 60 [107 Cal.Rptr.2d 110] [same; use of PCR and STR methods]; *People v. Allen* (1999) 72 Cal.App.4th 1093, 1099 [85 Cal.Rptr.2d 655] [same; STR testing]; *People v. Morganti* (1996) 43 Cal.App.4th 643, 666 [50 Cal.Rptr.2d 837] [same; PCR procedures].) Use of the product rule as a means of calculating genetic profile frequency has also gained general acceptance. (See, e.g., *People v. Soto, supra,* 21 Cal.4th at pp. 514–515 [use of unmodified product rule in restriction fragment length polymorphism (RFLP) analysis generally accepted in relevant scientific community]; *People v. Reeves* (2001) 91 Cal.App.4th 14, 41–42 [109 Cal.Rptr.2d 728] [same; PCR analysis].)

Appellant says this is not so when the suspect comes to light by way of a database trawl instead of through non-DNA evidence. However, the use of database searches as a means of identifying potential suspects is not new or novel. "DNA data base and data bank acts have been enacted in all 50 states as well as by the federal government. [Citations.]" (*Alfaro v. Terhune* (2002) 98 Cal.App.4th 492, 505 [120 Cal.Rptr.2d 197].)[13] "[California's] DNA and Forensic Identification Data Base and Data Bank program had its genesis in former section 290.2, enacted in 1983. [Citation.]" (*Alfaro,* at p. 497.) Although the statute originally referred to blood grouping analysis, explicit provisions for DNA and other genetic typing analysis, as well as maintenance of a computerized database, were added by the 1989 amendment to the

---

[13] "Databank" (or "data bank") may be variously defined as "[a] data base" or "[a]n organization chiefly concerned with building, maintaining, and utilizing a data bank." "Database" (or "data base") refers to "[a] collection of data arranged for ease and speed of retrieval, as by a computer." (The American Heritage Dict. (2d College ed. 1985) p. 366.)

statute. (See Stats. 1989, ch. 1304, § 1.5, pp. 5176–5178.) Congress authorized the FBI to establish an index of DNA identification records in 1994 (42 U.S.C. § 14132; Pub.L. No. 103-322 (Sept. 13, 1994) 108 Stat. 2069) and, in 2000, authorized grants to states to carry out DNA analyses for inclusion in CODIS (42 U.S.C. § 14135; Pub.L. No. 106-546 (Dec. 19, 2000) 114 Stat. 2726).[14] We recognize that, "[i]n determining whether a scientific technique is 'new' for *Kelly* purposes, long-standing use by police officers seems less significant a factor than repeated use, study, testing and confirmation by scientists or trained technicians." (*People v. Leahy, supra,* 8 Cal.4th at p. 605.) By its very nature, however, DNA analysis requires the involvement of scientists and trained technicians.

■ This brings us to our core point: the database search merely provides law enforcement with an investigative tool, not evidence of guilt. (See *United States v. Scheffer* (1998) 523 U.S. 303, 312, fn. 8 [140 L.Ed.2d 413, 118 S.Ct. 1261] [distinguishing between reliability of polygraph testing when used as tool in criminal and intelligence investigations, and as evidence at trials].) ■ We are aware of no authority applying *Kelly*'s requirements to a mere investigative technique.[15] Indeed, *Frye* and its progeny—including *Kelly*— are concerned with the effect of scientific evidence *on the jury*. (See, e.g., *People v. Leahy, supra,* 8 Cal.4th at p. 595; *People v. Stoll, supra,* 49 Cal.3d at pp. 1155–1157; *Kelly, supra,* 17 Cal.3d at pp. 31–32; *Frye, supra,* 293 Fed. at p. 1014.)

In our view, the means by which a particular person comes to be suspected of a crime—the reason law enforcement's investigation focuses on him—is irrelevant to the issue to be decided at trial, i.e., that person's guilt or innocence, except insofar as it provides *independent* evidence of guilt or innocence. For example, assume police are investigating a robbery. The victim identifies "Joey" as the perpetrator. The means by which "Joey" becomes the focus of the investigation—the eyewitness identification—is relevant because that identification is itself evidence of guilt. Suppose instead

---

[14] "[T]he FBI, in conjunction with state and local forensic laboratories, has created a computerized database of DNA profiles of known, convicted offenders and unknown forensic DNA samples. The Combined DNA Index System database, known as CODIS, allows law enforcement at all levels to compare DNA profiles electronically." (*State v. Traylor* (Minn. 2003) 656 N.W.2d 885, 888.)

[15] *People v. Leahy, supra,* 8 Cal.4th 587, dealt with law enforcement's use of horizontal gaze nystagmus (HGN) as an indicator of intoxication. In that case, the defendant was stopped for speeding. Although he exhibited conventional symptoms of intoxication, the officer decided to administer field sobriety tests. The defendant passed two of them, but failed the HGN test. The officer then arrested him and administered an intoxilyzer test. (*Id.* at p. 592.) Although the HGN field sobriety test might be considered an investigative tool, in *Leahy* the arresting officers were permitted to testify at trial concerning the relationship between the HGN test and the defendant's intoxication. (*Id.* at pp. 593, 606–607.) The test was thus presented to the jury as something more authoritative than a mere investigative technique.

that a surveillance camera captures the robbery on tape. Police use facial recognition software to check the robber's facial features against driver's license photographs. When the computer indicates a match with "Joey," officers obtain his name and address from DMV records, then go to his house and interview him. In the course of the interview, "Joey" confesses. Whether facial recognition software is discerning and accurate enough to select *the* perpetrator, or whether it declared a match involving many different people who resembled "Joey," or how many driver's license photographs were searched by the software, is immaterial: what matters is the subsequent confirmatory investigation.[16]

Stated another way, the fact that the perpetrator's features appear to match those of someone in the DMV database does not affect the strength of the evidence against "Joey"; it is simply a starting point for the investigation. Similarly, the fact that here, the genetic profile from the evidence sample (the perpetrator's profile) matched the profile of someone in a database of criminal offenders, does not affect the strength of the evidence against appellant. The strength of the evidence against him (at least in terms of the DNA evidence) depends upon the confirmatory match between *his* profile and that of the perpetrator, and the calculation of the frequency of the *perpetrator's* profile in the relevant population. That population is the population of possible perpetrators, not the population of convicted offenders whose DNA has been entered into CODIS. The fact appellant was first identified as a possible suspect based on a database search simply does not matter.[17]

Appellant says the questions, " 'What is the rarity of the DNA profile in the population at large?' and 'What is the probability of finding such a DNA profile in the database searched?' " are two different inquiries that produce two different answers. We agree. We do not agree, however, that the probability of finding a particular DNA profile in the database searched—CODIS—matters. Appellant asks us to consider, by way of example, a case in which a victim describes her attacker, but the attack leaves her blind and unable to engage in an identification procedure. If a suspect is developed based on suspicious actions near the crime scene, appellant says, and if he matches each one of the eight unusual, visible characteristics described by the victim, then the probative value of the match is great. If, on the other hand,

[16] We recognize that our facial recognition software example does not involve a statistical computation step as does DNA analysis. Nevertheless, in our view it demonstrates the irrelevance, for trial purposes, of the database trawl.

[17] We are not presented with, and express no opinion concerning, a situation in which the fact of the preliminary, "cold hit" match from the offender database is offered as evidence of guilt. Although, in the present case, the same 13 loci were examined in each instance, the clear implication of Ma's testimony—that the offender samples are processed by robot, instead of manually, because so many samples are processed each day—is that the "cold hit" is a preliminary, investigative match.

the police start looking through DMV photographs and eventually come across someone who matches all eight characteristics, it is no longer appropriate to ask the random match probability question, i.e., "What are the chances a randomly selected person would just happen to share the eight distinctive visible characteristics as the assailant[?]" because the suspect was not randomly selected. Instead, he was selected precisely because he shared those traits. It may be that, in a cold hit case, the relevant question is better phrased as, "What is the rarity/frequency of the combination of traits (the genetic profile) in the population of possible perpetrators?"[18] This does not, however, mean *Kelly*'s foundational requirements must be met in such a case; as we have said, the techniques and procedures are not new, novel, or experimental.

Although the California Supreme Court has observed that fingerprint evidence is different from DNA for purposes of *Kelly*'s third prong because jurors can essentially see fingerprints for themselves (*People v. Venegas, supra,* 18 Cal.4th at p. 81), we find *People v. Farnam* (2002) 28 Cal.4th 107 [121 Cal.Rptr.2d 106, 47 P.3d 988] instructive. In that case, the prosecution presented evidence concerning the Los Angeles Police Department's use of a computerized database for fingerprint matching. This database, the CAL-ID system, produced a list of candidates, including the defendant, whose fingerprints were similar to those found at the crime scene. After this initial identification of the defendant as a possible candidate for a match, a latent print analyst visually compared the defendant's fingerprint card to the latent prints taken from the crime scene, and determined that the prints appeared to match. Another examiner—Erwin—then confirmed that the prints matched. (*Id.* at p. 159.)

On appeal, the defendant argued that admission of evidence concerning the CAL-ID system constituted error because the evidence was irrelevant and confusing, and because it lacked the requisite scientific foundation under *Kelly.* (*People v. Farnam, supra,* 28 Cal.4th at p. 159.) The California Supreme Court concluded *Kelly* was inapplicable (*Farnam,* at p. 160, fn. 27) and, accordingly, rejected both arguments, stating:

"Assuming . . . that Erwin's testimony concerning the computerized fingerprint matching program had little or no relevance, the testimony presented little, if any, potential for prejudice. Contrary to defendant's assertions, it was not 'the type of evidence that might evoke prejudice' by 'making it appear as though [defendant] was the subject of some unimpeachable computerized decision.' Rather, Erwin's testimony clarified that the

---

[18] Although Ma presented her calculations in terms of random occurrence of the DNA profile among unrelated individuals, she consistently explained that the resulting figures represented an estimation of the rarity of the genetic profile in the population.

CAL-ID system did not actually make identifications and that it merely pointed police to candidates in the fingerprint database who come closest to matching a particular latent print. Once a candidate list was produced, he explained, it would remain necessary for a qualified expert to make a visual comparison to determine the existence of a match. Given the clear import of such testimony, there was no potential for juror confusion, and the trial court did not abuse its discretion in admitting the evidence. . . .

"Defendant's contention based on *Kelly* . . . fares no better. Under *Kelly*, 'the proponent of evidence based on a "new" scientific technique' must 'establish its general acceptance within the relevant scientific community.' [Citations.] 'This approach is intended to prevent lay jurors from being unduly influenced by procedures which seem scientific and infallible, but which actually are not.' [Citation.] On the other hand, where 'a procedure isolates physical evidence whose existence, appearance, nature, and meaning are obvious to the senses of a layperson, the reliability of the process in producing that result is equally apparent and need not be debated under the standards of *Kelly*. . . .' [Citation.]

"We conclude that the admission of Erwin's testimony concerning the CAL-ID system did not implicate the concerns addressed in *Kelly*. The reliability of the computerized system in comparing latent prints to finger-prints in its database was apparent at trial. The jury could make its own comparisons between the latent prints found at the . . . crime scene and defendant's fingerprints, and there was no dispute that the system made its comparisons 'without tampering or alteration of any kind.' [Citation.] More-over, Erwin did not suggest that the CAL-ID system positively identified the latent prints as defendant's fingerprints, or that any opinion regarding a fingerprint identification was based on the computer. *Although the police used the CAL-ID system to narrow the range of potential candidates whose fingerprints might match the latent prints, the prosecution relied on a long-established technique—fingerprint comparison performed by fingerprint experts—to show the jury that defendant's fingerprints matched those found at the [crime scene].* Accordingly, the trial court did not err under *Kelly* when it admitted Erwin's testimony." (*People v. Farnam*, at pp. 159–160, italics added, fn. omitted.)

In our view, *Kelly* is equally inapplicable here: police used CODIS to narrow the range of potential candidates whose genetic profiles might match that of the evidence sample (the perpetrator's profile), after which the prosecution relied on scientifically accepted techniques to show the jury that appellant's genetic profile matched that of the perpetrator, and the astronomi-cal rarity of that profile in the population of possible perpetrators.

Appellant claims, however, that in a cold hit case, the results derived from the product rule do not accurately represent the probability of finding a matching profile by chance. As we understand his argument and the materials of which we have previously taken judicial notice, this is due to ascertainment bias, i.e., the bias that exists when one searches for something rare in a set database. In other words, the fact that many profiles have been searched increases the probability of finding a match, so that conceptually, the more populated the database, the less impressive the match. Appellant contends that there is broad scientific consensus concerning the need to determine differently the statistical significance of profile matches in a cold hit case versus a confirmation case, but says that the means of determining the statistical value of a cold hit "is a matter of continuing and strident debate."

*United States v. Jenkins* (D.C.Ct.App. 2005) 887 A.2d 1013 (*Jenkins*) is the only published opinion we have been able to find that addresses this contention. In that case, evidence samples from a homicide scene were run through Virginia's DNA database of 101,905 offenders. It was determined that a profile compiled from eight of the thirteen loci was consistent with the eight-loci profile of Jenkins. At this point, the police investigation focused solely on Jenkins. A search warrant was obtained for his blood; the FBI created a 13-loci profile for his DNA, and determined that it matched the 13-loci profile from the evidence samples obtained from the crime scene. (*Id.* at pp. 1016–1017.) Prior to trial, Jenkins moved to exclude the DNA evidence, arguing that the FBI's method of presenting the rarity statistic alone to express the significance of a DNA match between a crime scene sample and a suspect identified through a database search, is not generally accepted in the relevant scientific community and so was inadmissible under *Frye*. To support his position, Jenkins provided evidence that he believed established the existence of "a 'raging debate' in the scientific and statistical community regarding the most appropriate method for calculating the significance of a cold hit." (*Id.* at p. 1017.) The trial court agreed and granted the motion to exclude. (*Id.* at p. 1016.)

In reversing the trial court's ruling, the appellate court noted that the *Frye* analysis "begins and ends with 'the acceptance of particular scientific methodology' and not the acceptance of a particular result or conclusion derived from that methodology," and it found that the trial court "erred in failing to focus on methodology." (*Jenkins, supra*, 887 A.2d at p. 1022.) The appellate court reasoned that the scientific "debate" constituted "a disagreement over the competing questions to be asked, not the methodologies used to answer those questions" (*ibid.*), and it viewed the issue as one of relevancy, i.e., which number "is most relevant in signifying the importance of a cold hit" (*id.* at p. 1025). Because *Frye* focuses on whether the methodology is generally accepted, the court concluded, there was no basis for exclusion of the DNA evidence. (*Id.* at p. 1023.)

*Jenkins* does not convince us that the probability of obtaining a cold hit from a search of the CODIS database matters when, as here, the cold hit merely focuses an investigation on a particular suspect, nor do we view the issue strictly as one of relevance. Moreover, in our opinion, submitting the issue of the value of restrictive and expansive databases to a jury (as through the presentation of various statistical analyses) would raise significant relevancy and Evidence Code section 352 issues. Nevertheless, we agree with the *Jenkins* court's conclusion that the "debate" cited by appellant (and Jenkins) is fundamentally different from the type of disagreement that caused courts in this state initially to hold that the determination of a match's statistical significance had not yet received general scientific acceptance. Those cases were concerned with what was described as a "fundamental disagreement" among population geneticists concerning whether the statistical calculation process was "fundamentally flawed" due to genetic substructuring and linkage disequilibrium. (*People v. Barney, supra,* 8 Cal.App.4th at pp. 814–819; see *People v. Soto, supra,* 21 Cal.4th at pp. 515–516; *People v. Venegas, supra,* 18 Cal.4th at pp. 86–88; *People v. Reeves, supra,* 91 Cal.App.4th at pp. 38–41; *People v. Morganti, supra,* 43 Cal.App.4th at pp. 669–670; *People v. Taylor, supra,* 33 Cal.App.4th at pp. 266–267.) We also agree with the *Jenkins* court's conclusion that no new methodology is involved in "cold hit" cases (*Jenkins, supra,* 887 A.2d at p. 1024); hence, *Kelly* is not implicated.

The trial court did not err in admitting the DNA evidence.[19]

---

[19] While recognizing that a finding of "no general acceptance" under *Kelly* results in the exclusion of evidence, we cannot help but observe that frequencies in the quadrillions (or, as in *Jenkins*, even the quintillions or sextillions) are to be expected as more loci are examined. It does not take a statistician to realize that, in most cases, multiplying 13 numbers will result in a greater product than will multiplying nine numbers; hence, a 13-loci calculation will result in a substantially rarer profile than a calculation based on nine loci. If even more loci are compared and analyzed, the numbers will increase again, meaning the genetic profile will be even rarer. Given this reality and the numbers involved, we find it highly questionable, as a practical matter, whether the use of one formula instead of another will truly be of any real benefit to someone in appellant's position. For instance, the evidence in this case showed a frequency, in the Hispanic population, of one in 4.3 quadrillion. Under the NRC II approach of multiplying this number by the number of samples in the CODIS database (200,000), appellant calculates an adjusted frequency of one in 21.5 billion. This appears to be a large difference—until one realizes the population of the entire United States is slightly less than 300 million (U.S. POPClock Projection, U.S. Census Bureau, at <http://www.census.gov/population/www/popclockus.html> [as of May 25, 2006]), and the population of the whole world is just over 6.5 billion (World POPClock Projection, U.S. Census Bureau, at <http://www.census.gov/ipc/www/popclockworld.html> [as of May 25, 2006].)

## B. *Presentation of Frequency Calculations for Caucasian and African-American Populations*

■ In *People v. Pizarro, supra,* 110 Cal.App.4th at page 623, we stated: "[A]n ethnic profile frequency relies for its relevance on the foundational showing that the perpetrator is a member of the particular ethnicity. ([Evid. Code,] § 403.) The ethnic frequency is subject to a relevance analysis and is not made relevant simply because it is based on the *defendant's* ethnicity."

In the present case, as we have described, ethnic profile frequencies were presented for Caucasian, African-American, and Hispanic populations. Appellant implicitly concedes that, in light of G.N.'s description of her assailant as Hispanic, a sufficient foundational showing was made so that admission of the Hispanic database frequency was proper. He claims, however, that presentation of probabilities computed from the other databases was error.[20] Assuming the issue was sufficiently preserved for appeal, we need not be drawn, once again, into a debate with respondent over whether *Pizarro* was wrongly decided: any error here was manifestly harmless. Calculations based on the three databases were presented because they represent the three most common ethnic groups and not because of appellant's ethnicity; G.N.'s description of her assailant furnished sufficient evidence, for purposes of Evidence Code section 403, that the perpetrator was Hispanic and so presentation of the Hispanic database figure was proper; and appellant fails to suggest how presentation of the other figures could possibly have harmed him, especially in light of the fact that the Hispanic database figure was the most favorable to him.

## C. *Validity of the Search and Seizure*

### 1. *Background*

Appellant moved to suppress, inter alia, all blood or saliva samples taken from him on February 25, 1992, while he was incarcerated at Mule Creek State Prison, together with any DNA testing performed on them; all blood or saliva samples taken from him on December 12, 2002, while he was incarcerated at Corcoran State Prison, together with any DNA testing performed on them; and any subsequent identification of him made as a result of the DNA testing. He contended that the taking of bodily fluids constituted a search under the Fourth Amendment to the United States Constitution, and that former section 290.2 and its successor statute, section 295, are unconstitutional. The trial court denied the motion, concluding that the drawing of

---

[20] The issue is currently pending before the California Supreme Court in *People v. Wilson,* review granted February 16, 2005, S130157,[*] and *People v. Prince,* review granted March 15, 2006, S140277.[†]

---

[*] Reporter's Note: For Supreme Court opinion, see 38 Cal.4th 1237.
[†] Reporter's Note: Review dismissed August 16, 2006.

blood was permissible and authorized by statute, and that neither a search warrant nor probable cause was required.

Appellant now contends the identification of him was the fruit of an unlawful search of his person; hence, his suppression motion should have been granted. Appellant argues that his DNA profile was in the CODIS database because in 1992, while he was serving a prison term for a prior offense, a blood sample was taken from him pursuant to former section 290.2 and subsequently analyzed without a warrant, probable cause, or even reasonable suspicion. He says that the drawing of his blood constituted a search and seizure within the ambit of the Fourth Amendment, and said search and seizure were unlawful because they were conducted without individualized suspicion to believe he had committed any unadjudicated offense. He concludes that, because all evidence of his identity was the fruit of this Fourth Amendment violation, reversal of his conviction is required.

2. *Analysis*

■ As it existed in 1992, former section 290.2 required persons who had been convicted of specified crimes, and who were paroled or otherwise released, to provide two specimens of blood and a saliva sample prior to that release. The samples so provided were then to be forwarded to the Department of Justice for DNA analysis and other genetic typing.[21] The section was

---

[21] In 1992, former section 290.2 provided, in pertinent part:

"(a) Any person who is required to register under Section 290 [pertaining to the registration of sex offenders] because of the commission of, or the attempt to commit, a felony offense specified in Section 290, or who is convicted of murder . . . , or who is convicted of a felony offense of assault or battery . . . , and who is discharged or paroled from a state prison, . . . shall, prior to discharge, parole, . . . or release, be required to provide two specimens of blood and a saliva sample to that institution. . . .

"The withdrawal of blood shall be performed in a medically approved manner. . . .

"(b) The Department of Justice shall provide all blood specimen vials, mailing tubes, labels, and instructions for the collection of the blood specimens and saliva samples. The specimens and samples shall thereafter be forwarded to the Department of Justice for analysis of deoxyribonucleic acid (DNA) and other genetic typing analysis at the department's DNA laboratory.

"The Department of Justice shall perform DNA analysis and other genetic typing analysis only for law enforcement purposes.

"(c) The Department of Justice DNA laboratory shall perform genetic typing only for those markers having value for law enforcement purposes.

"For purposes of this subdivision, 'marker' shall have the meaning generally ascribed to it by members of the scientific community experienced in the use of DNA technology.

"(d) The DNA and other genetic typing information shall be filed with the offender's file maintained by the Sex Registration Unit of the Department of Justice or in a computerized data bank system, and shall not be included in the state summary criminal history information.

"The computerized data bank system shall be limited to containing information only on individuals convicted of crimes specified in subdivision (a), or evidence accumulated from

repealed by Statutes 1998, chapter 696, section 1, page 3718. Its subject matter is now covered by section 295 et seq.

There can be no doubt that the involuntary taking of DNA samples constitutes a search and seizure under the Fourth Amendment (see *Schmerber v. California* (1966) 384 U.S. 757, 767 [16 L.Ed.2d 908, 86 S.Ct. 1826]), and that "[t]he touchstone of the Fourth Amendment is reasonableness. [Citation.]" (*Florida v. Jimeno* (1991) 500 U.S. 248, 250 [114 L.Ed.2d 297, 111 S.Ct. 1801].) "To be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. [Citation.]" (*Chandler v. Miller* (1997) 520 U.S. 305, 313 [137 L.Ed.2d 513, 117 S.Ct. 1295].) Respondent implicitly concedes no such individualized suspicion existed here, nor is it required under DNA collection statutes such as former section 290.2.

Nevertheless, numerous state and federal courts have rejected arguments similar to those appellant makes here. These cases have upheld DNA collection statutes against Fourth Amendment challenges either under a special needs analysis or under a traditional assessment of reasonableness gauged by the totality of the circumstances. (See, e.g., *Alfaro v. Terhune, supra,* 98 Cal.App.4th at p. 505 & cases cited; *United States v. Kincade* (9th Cir. 2004) 379 F.3d 813, 830–831 (plur. opn. by O'Scannlain, J.) & cases cited.)[22]

---

crime scenes during ongoing investigations and believed to have been left by a person suspected of having committed a violent felony specified in subdivision (c) of Section 667.5 or an offense specified in Section 290. Evidence accumulated pursuant to this provision from any crime scene with respect to a particular person shall be stricken from the data bank when it is determined that the person is no longer a suspect in the case."

The statute further provided for strict limitations on disclosure and dissemination of DNA and other genetic typing information; required the Department of Justice to make public the methodology and procedures used in its DNA program; and required it to review and consider on an ongoing basis the findings and results of any peer review and validation studies submitted to it by members of the relevant scientific community.

[22] We perceive some overlap between the analyses. Under the traditional approach, "the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' [Citation.]" (*United States v. Knights* (2001) 534 U.S. 112, 118–119 [151 L.Ed.2d 497, 122 S.Ct. 587].) The term "special needs" first appeared in Justice Blackmun's concurring opinion in *New Jersey v. T.L.O.* (1985) 469 U.S. 325, 351 [83 L.Ed.2d 720, 105 S.Ct. 733] (conc. opn. of Blackmun, J.). (See *Ferguson v. City of Charleston* (2001) 532 U.S. 67, 75, fn. 7 [149 L.Ed.2d 205, 121 S.Ct. 1281].) Under this approach, "particularized exceptions to the main rule [requiring individualized suspicion of wrongdoing] are sometimes warranted based on 'special needs, beyond the normal need for law enforcement.' [Citation.] When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties. [Citation.] . . . 'In limited circumstances, where the privacy interests implicated

*People v. King* (2000) 82 Cal.App.4th 1363 [99 Cal.Rptr.2d 220] (*King*) rejected a challenge to former section 290.2. In that case, King was convicted of forcible rape in 1984. Before his release from prison in 1991, he provided blood samples for DNA analysis pursuant to the statute. The samples were analyzed and a genetic profile developed, and the profile was placed in the DNA laboratory's data bank. Subsequently, in 1992, Leticia Smith was murdered. Bodily fluids recovered from the crime scene were analyzed in 1995, and the genetic profile was found to match the DNA profile from the samples collected from King in 1991. Blood drawn from King in 1995 was then analyzed; the DNA profiles again matched, and statistical evidence established that the profile was exceedingly rare. King was subsequently convicted of murder. On appeal, he claimed the conviction was based on inadmissible DNA evidence. (*Id.* at pp. 1367–1369.)

The appellate court began by recognizing that, as a general rule, whether a particular practice is unreasonable, and so violates the Fourth Amendment, is determined by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests. (*King, supra*, 82 Cal.App.4th at p. 1371, citing *Skinner v. Railway Labor Executives' Assn.* (1989) 489 U.S. 602, 619 [103 L.Ed.2d 639, 109 S.Ct. 1402] (*Skinner*).) King argued, however, that it was improper to engage in a balancing test, because the general rule is that a search may be initiated only after a warrant has been issued upon probable cause, and so a court should engage in a balancing test only if it first determines that the case falls within a recognized exception to this general rule. (*King, supra*, 82 Cal.App.4th at p. 1371.) King relied on language in *Skinner*, in which the Supreme Court recognized the special needs exception, stating: "In most criminal cases, we strike this balance in favor of the procedures described by the Warrant Clause of the Fourth Amendment. [Citations.] Except in certain well-defined circumstances, a search or seizure in such a case is not reasonable unless it is accomplished pursuant to a judicial warrant issued upon probable cause. [Citations.] We have recognized exceptions to this rule, however, 'when "special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." ' [Citations.] When faced with such special needs, we have not hesitated to balance the governmental and privacy interests to assess the practicality of the warrant and probable-cause requirements in the particular context. [Citations.]" (*Skinner, supra*, 489 U.S. at p. 619.)

by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion.' [Citation.]" (*Chandler v. Miller, supra*, 520 U.S. at pp. 313–314.)

King argued that, because the DNA testing at issue was done only to further the normal need for law enforcement, neither the special needs exception nor any other recognized exception to the warrant and probable cause requirements existed. Thus, it was unnecessary and improper to engage in a balancing of competing interests. (*King, supra,* 82 Cal.App.4th at p. 1372.) The appellate court disagreed, stating:

"Cases such as *Skinner* and [*Treasury Employees v.*] *Von Raab* [(1989) 489 U.S. 656 [103 L.Ed.2d 685, 109 S.Ct. 1384] (*Von Raab*)] do no more than recognize that the competing interests do not vary in the vast majority of Fourth Amendment cases; i.e., in most criminal investigations. It therefore is unnecessary in 'most criminal cases' to balance the competing interests, because the balance in such cases already has been struck in favor of the procedures described by the warrant clause of the Fourth Amendment. The circumstances in cases such as *Skinner* and *Von Raab*, however, or in the other recognized 'exceptions,' are significantly different from those in a typical criminal investigation. The balance that has been struck in 'most criminal cases,' therefore, is not necessarily the balance that should be struck in these cases. The Supreme Court in *Vernonia School Dist. 47J v. Acton* (1995) 515 U.S. 646 [132 L.Ed.2d 564, 115 S.Ct. 2386] [*Vernonia*]—another 'special needs' case, explained: 'As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness." At least in a case such as this, where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard " 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' " [Citations.]' [Citation.]

"The typical criminal case is one where a crime has been committed, an investigation has been initiated and the investigators are attempting to gather evidence for the purpose of solving a particular crime or to build a case against a particular individual. The investigators exercise great discretion, deciding who to investigate, how to conduct that investigation, and what, if anything, should be seized as evidence. At the very least, such searches inconvenience involved persons. There also is a substantial likelihood that such a search will generate fear and surprise in persons who, as a result of the search, reasonably may believe that they have become the focus of a police investigation. This is not the situation, however, when the 'search' is the securing of blood and saliva samples for DNA analysis and profiling. The samples are not taken as part of an investigation of a particular crime. The decision to obtain a sample from a particular person is not subject to official discretion. There is no focus on a particular person. As those who are required to provide samples doubtless know, every person of the specified class is required to provide a sample. The person supplying the samples

therefore has no reason to fear that the intrusion suggests a belief by the authorities that he or she has committed any criminal offense, or that he or she may be subjected to any further investigation.[23] The fact that the person is already incarcerated also tends to reduce the inconvenience of having to go to a particular place to provide samples.

■ "There is little reason to require a warrant in such circumstances. A judicial warrant is a necessary component of the 'normal need for law enforcement,' because it protects privacy interests 'by assuring citizens subject to a search or seizure that such intrusions are not the random or arbitrary acts of government agents. A warrant assures the citizen that the intrusion is authorized by law, and that it is narrowly limited in its objectives and scope. [Citations.] A warrant also provides the detached scrutiny of a neutral magistrate, and thus ensures an objective determination whether an intrusion is justified in any given case.' [Citations.] A warrant, however, provides little or no additional protection to personal privacy when, as in the present case, the circumstances justifying the testing and the permissible limits of the intrusion are defined narrowly and specifically, these circumstances doubtless are well-known to those in the class of persons to be tested, and the decision to test is not discretionary and thus is not based on a judgment that certain conditions are present. In such circumstances 'there are simply "no special facts for a neutral magistrate to evaluate," ' and it is reasonable to dispense with the warrant requirement. [Citations.]" (*King, supra*, 82 Cal.App.4th at pp. 1372–1373.)

The court went on to recognize that even a warrantless search generally must be conducted upon some quantum of individualized suspicion before it can be concluded that the search was reasonable. (*King, supra*, 82 Cal.App.4th at p. 1373.) In *Skinner*, however, the United States Supreme Court observed that "a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable. [Citation.] In limited circumstances, where the privacy interests implicated by a search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion." (*Skinner, supra*, 489 U.S. at p. 624.) The *King* court found that such circumstances existed with respect to former section 290.2. It noted that confinement in prison necessarily results in a significant reduction in the expectation of privacy, and that even the privacy interests of inmates in their own bodies must bow to

---

[23] This is especially true in the present case, where the samples were obtained from appellant in 1992, but the offense that forms the basis of the instant appeal was not committed until 1996.

other interests, such as those of prison officials in ensuring that weapons and contraband are not brought into prison institutions. (*King, supra,* at p. 1374.) It reasoned:

■■ "The reduction in a convicted person's reasonable expectation of privacy specifically extends to that person's identity. Indeed, not only persons convicted of crimes, but also those merely suspected of crimes, routinely are required to undergo fingerprinting for identification purposes. As to convicted persons, there is no question but that the state's interest extends to maintaining a permanent record of identity to be used as an aid in solving past and future crimes, and this interest overcomes any privacy rights the individual might retain. . . . And once an individual has been convicted of a crime or crimes, and has been incarcerated in a penal institution, his or her identity clearly becomes a matter of interest to prison officials. . . . 'The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as "legitimate." [Citation.] What expectations are legitimate varies, of course, with context [citation], depending, for example upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park.' [Citation.] By their commissions of a crime and subsequent convictions, persons such as appellant have forfeited any legitimate expectation of privacy in their identifies. In short, any argument that Fourth Amendment privacy interest do not prohibit gathering information concerning identity from the person of one who has been convicted of a serious crime, or of retaining that information for crime enforcement purposes, is an argument that long ago was resolved in favor of the government.[24]

■■ "On the other hand, the government has an undeniable interest in crime prevention. It has interests in solving crimes that have been committed, in bringing the perpetrators to justice and in preventing, or at least discouraging, them from committing additional crimes. The government also has an interest in ensuring that innocent persons are not needlessly investigated—to say nothing of convicted—of crimes they did not commit.[25] DNA testing unquestionably furthers these interests. The ability to match DNA profiles

---

[24] "Appellant voices concerns that once DNA profiling is permitted for one purpose, it creates the possibility of misuse and makes it that much easier to permit DNA profiling for other purposes. It is enough that Penal Code former section 290.2 limited the use of DNA evidence, prohibiting its use for anything other than law enforcement purposes. Whether it constitutionally might be used for some other purpose is a question that is not before us."

[25] In a footnote at this point, the court referred to the Legislature's purpose for the DNA testing procedures, as expressed in section 295, subdivision (c). That statutory provision was worded slightly differently at the time *King* was decided. It now provides: "The purpose of the DNA and Forensic Identification Database and Data Bank Program is to assist federal, state, and local criminal justice and law enforcement agencies within and outside California in the expeditious and accurate detection and prosecution of individuals responsible for sex offenses

derived from crime scene evidence to DNA profiles in an existing data bank can enable law enforcement personnel to solve crimes expeditiously and prevent needless interference with the privacy interests of innocent persons. It has been suggested that DNA profiling may act as a deterrent to future criminal activity. [Citation.] It also is an unfortunate truth that many offenders commit more than one crime, and recidivism is common. [Citation.] Speedy identification and apprehension of an offender, therefore, will prevent crime even if DNA testing has no deterrent effect on criminal activity." (*King, supra,* 82 Cal.App.4th at pp. 1374–1376.)

In reviewing United States Supreme Court precedent, the *King* court determined that "the relevant inquiry is not whether the circumstances of a particular search fall within the specific 'exception' to ordinary Fourth Amendment requirements recognized in an individual case, but whether the privacy interests and the governmental interests at stake so differ from those involved in normal law enforcement, that they justify a departure from the established requirement of a judicial warrant issued upon probable cause. [¶] It therefore is unnecessary to determine if the taking of samples for DNA analysis might be deemed to answer to 'special needs,' beyond the normal need for law enforcement [citations], or if it presents a separate category of search to which the per se requirement of probable cause does not apply. [Citations.] What is significant is that the taking of blood and saliva samples for DNA analysis is not the kind of a search that was either approved or disapproved at the time the Fourth Amendment was enacted, that such a taking differs in fundamental ways from searches undertaken in 'most criminal cases,' and that whatever privacy interest persons such as appellant retain in their identities is far less than that of persons subject to searches and seizures in the course of ordinary law enforcement." (*King, supra,* 82 Cal.App.4th at pp. 1376–1377.) Accordingly, the court concluded, "[w]hether the DNA testing procedures pass muster under the Fourth Amendment should be determined by balancing their intrusion on the individual's privacy interests against their promotion of legitimate governmental interest." (*Id.* at p. 1377.)

In striking that balance, the appellate court found that the privacy interests were minimal, as was the scope of the intrusion authorized by the statute. On the other hand, the governmental interests furthered by the intrusion required by DNA analysis were important—arguably even greater than those at stake in " 'normal law enforcement' "—because of the potential to solve and prevent large numbers of crimes, and to protect innocent persons from needless investigation. (*King, supra,* 82 Cal.App.4th at p. 1377.) The court further concluded that the reasons for requiring a warrant did not exist, and

and other crimes, the exclusion of suspects who are being investigated for these crimes, and the identification of missing and unidentified persons, particularly abducted children."

that DNA testing was an efficient means of promoting the governmental interests at stake. Accordingly, it concluded that the procedures outlined in former section 290.2 did not violate the Fourth Amendment. (82 Cal.App.4th at p. 1378.)

In *Alfaro v. Terhune, supra,* 98 Cal.App.4th 492, a group of female prisoners on death row argued they should not have to comply with section 295 et seq. because there was no possibility they could commit another crime. The appellate court cited *King, Rise v. State of Oregon* (9th Cir. 1995) 59 F.3d 1556, and other authorities, and concluded: "In view of the thoroughness with which constitutional challenges to DNA data base and data bank acts have been discussed, there is little we would venture to add. We agree with existing authorities that (1) nonconsensual extraction of biological samples for identification purposes does implicate constitutional interests; (2) those convicted of serious crimes have a diminished expectation of privacy and the intrusions authorized by the Act are minimal; and (3) the Act serves compelling governmental interests. Not the least of the governmental interests serviced by the Act is 'the overwhelming public interest in prosecuting crimes *accurately.*' [Citation.] A minimally intrusive methodology that can serve to avoid erroneous convictions and to bring to light and rectify erroneous convictions that have occurred manifestly serves a compelling public interest. We agree with the decisional authorities that have gone before and conclude that the balance must be struck in favor of the validity of the Act." (*Alfaro, supra,* 98 Cal.App.4th at pp. 505–506.)

Appellant contends, however, that these decisions (and that in *People v. Adams* (2004) 115 Cal.App.4th 243 [9 Cal.Rptr.3d 170], which we will discuss *post*) should not be followed because they are inconsistent with the line of United States Supreme Court authority exemplified by *City of Indianapolis v. Edmond* (2000) 531 U.S. 32 [148 L.Ed.2d 333, 121 S.Ct. 447] (*Edmond*), *Ferguson v. City of Charleston, supra,* 532 U.S. 67 (*Ferguson*), and *Illinois v. Lidster* (2004) 540 U.S. 419 [157 L.Ed.2d 843, 124 S.Ct. 885] (*Lidster*).

In *Edmond,* the Supreme Court—having previously upheld brief, suspicionless seizures at highway checkpoints for the purposes of combating drunk driving and intercepting illegal immigrants—considered the constitutionality of a highway checkpoint program whose primary purpose was the discovery and interdiction of illegal narcotics. (*Edmond, supra,* 531 U.S. at p. 34.) The Supreme Court emphasized that, in the border case, the considerations specifically related to the need to police the border were a significant factor in its decision. Similarly, the drunk driving checkpoints were aimed at reducing the immediate hazard posed by the presence of drunk drivers on the highways, and there was a clear connection between highway safety and the

law enforcement practice at issue. (*Id.* at pp. 38–39.) The gravity of the drunk driving problem and the magnitude of the state's interest in getting intoxicated drivers off the road weighed heavily in the high court's determination that the checkpoint program was constitutional. (*Id.* at p. 39.) The court pointed to the "difference in the Fourth Amendment significance of highway safety interests and the general interest in crime control" (*id.* at p. 40), and stated: "We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. Rather, our checkpoint cases have recognized only limited exceptions to the general rule that a seizure must be accompanied by some measure of individualized suspicion. We suggested . . . that we would not credit the 'general interest in crime control' as justification for a regime of suspicionless stops. [Citation.] Consistent with this suggestion, each of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment." (*Id.* at pp. 41–42.) The court recognized the "daunting and complex" problems created by the drug trade (*id.* at p. 42), but determined that "the gravity of the threat alone cannot be dispositive of questions concerning what means law enforcement officers may employ to pursue a given purpose. Rather, in determining whether individualized suspicion is required, we must consider the nature of the interests threatened and their connection to the particular law enforcement practices at issue. We are particularly reluctant to recognize exceptions to the general rule of individualized suspicion where governmental authorities primarily pursue their general crime control ends." (*Id.* at pp. 42–43.) The court declined "to suspend the usual requirement of individualized suspicion where the police seek to employ a checkpoint primarily for the ordinary enterprise of investigating crimes [or to] sanction stops justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime." (*Id.* at p. 44.)

In *Ferguson, supra,* 532 U.S. 67, the Supreme Court invalidated a hospital's program for protecting the unborn fetuses of women who were abusing drugs. The program involved conducting drug tests on women who met one or more specified criteria possibly indicating drug use, and then, if a woman failed the drug rehabilitation to which she was referred or again tested positive for drugs, the results were turned over to the police and the woman was arrested. (*Id.* at pp. 70–73.) The court examined its previous drug-testing cases—*Skinner, Von Raab, Vernonia,* and *Chandler v. Miller, supra,*

520 U.S. 305[26]—and stated: "The critical difference between those four drug-testing cases and this one . . . lies in the nature of the 'special need' asserted as justification for the warrantless searches. In each of those earlier cases, the 'special need' that was advanced as a justification for the absence of a warrant or individualized suspicion was one divorced from the State's general interest in law enforcement . . . . In this case, however, the central and indispensable feature of the policy from its inception was the use of law enforcement to coerce the patients into substance abuse treatment." (*Ferguson, supra,* at pp. 79–80, fns. omitted.) Thus, "[w]hile the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal." (*Id.* at p. 82–83, fns. & italics omitted.) The court emphasized that in none of its previous special needs cases had it upheld "the collection of evidence for criminal law enforcement purposes." (*Id.* at p. 83, fn. 20.) Moreover, it found the case different from those in which it applied a balancing test to determine Fourth Amendment reasonableness: those cases involved roadblock seizures, rather than intrusive searches of the body or the home, and the opinions explicitly distinguished the cases dealing with checkpoints from those dealing with special needs. (*Id.* at p. 83, fn. 21.)

In *Lidster, supra,* 540 U.S. 419, the high court returned to a checkpoint case. There, police set up a highway checkpoint and stopped motorists to ask for information about a recent hit-and-run accident. As Lidster approached the checkpoint, his vehicle swerved and nearly hit one of the officers. The officer smelled alcohol on Lidster's breath, and Lidster was subsequently arrested for, and convicted of, driving under the influence. On appeal, he claimed the checkpoint stop violated the Fourth Amendment. The Illinois Supreme Court agreed, finding the case was governed by *Edmond.* (*Lidster, supra,* at pp. 422–423.)

The United States Supreme Court disagreed, reasoning that, unlike in *Edmond,* the stop's primary law enforcement purpose was not to determine whether a vehicle's occupants were committing a crime, but to ask those occupants, as members of the public, for their help in providing information about a crime likely committed by others. In *Edmond,* by contrast, the stop was justified only by the generalized and ever-present possibility that interrogation and inspection might reveal that any given motorist had committed some crime. (*Lidster, supra,* 540 U.S. at pp. 423–424.) The court went on to

---

[26] In these cases, the high court sustained drug tests for railway employees involved in train accidents (*Skinner*), United States Customs Service employees seeking promotion to certain sensitive positions (*Von Raab*), and high school students participating in interscholastic sports (*Vernonia*), but struck down such testing for candidates for designated state offices (*Chandler v. Miller*).

say: "Neither do we believe, *Edmond* aside, that the Fourth Amendment would have us apply an *Edmond*-type rule of automatic unconstitutionality to brief, information-seeking highway stops of the kind now before us. For one thing, the fact that such stops normally lack individualized suspicion cannot by itself determine the constitutional outcome. As in *Edmond*, the stop here at issue involves a motorist. The Fourth Amendment does not treat a motorist's car as his castle. [Citations.] And special law enforcement concerns will sometimes justify highway stops without individualized suspicion. [Citations.] Moreover, unlike *Edmond*, the context here (seeking information from the public) is one in which, by definition, the concept of individualized suspicion has little role to play. Like certain other forms of police activity, say, crowd control or public safety, an information-seeking stop is not the kind of event that involves suspicion, or lack of suspicion, of the relevant individual." (*Lidster, supra,* at pp. 424–425.)

In *People v. Adams, supra,* 115 Cal.App.4th 243 (*Adams*), the defendant argued that collection of his blood for inclusion in the state's convicted offender DNA database, pursuant to section 295, violated the Fourth Amendment. He conceded that *King* was against him, but argued that *Ferguson* and *Edmond* made it clear that the special needs doctrine, not the balancing test articulated in *King*, was the controlling standard. (*Adams, supra,* at pp. 255–256.) The appellate court reviewed the requirements of section 295 et seq., and examined *Ferguson, Edmond, King,* and *Alfaro v. Terhune, supra,* 98 Cal.App.4th 492. It then rejected the defendant's challenge, reasoning:

"Defendant's assertion that this court must identify a ' "special needs" beyond the normal need for law enforcement' before undertaking a balancing analysis overlooks the fact that the class of persons subject to the Act is convicted criminals, not the general population. . . . [C]onvicted criminals do not enjoy the same expectation of privacy that nonconvicts do. The cases on which defendant relies involved different populations of test subjects. . . .

"Deterrence and prevention of future criminality and accurate prosecution of past crimes are purposes served by DNA testing and courts have upheld DNA acts for the law enforcement purpose of solving crimes. [Citations.] In addition, the Act exempts all DNA and forensic identification profiles and other identification information from any law requiring disclosure of information to the public, and it makes the information confidential. . . .[27] 'These provisions are relevant in determining the extent of the intrusion upon privacy interests and in balancing the intrusion against the public interests to be served. [Citation.]' [Citation.]

---

[27] As previously described in footnote 21, *ante,* former section 290.2 contained strict limits on dissemination of information.

"At oral argument defendant raised the specter of the passage of future statutes requiring every arrestee to give a blood sample or allowing law enforcement to insert its investigatory tentacles into any database . . . for law enforcement purposes even though the purposes for which the blood was collected were limited and the individuals retained privacy interests in their identities as was done and disapproved in *Edmond* [citation] and *Ferguson* [citation].

"Statutes attempting this may very well be in the future. We have no reason to discuss them absent their own particular circumstances and provisions. We are talking about a criminal justice database taken and maintained for criminal justice purposes. The individuals who are required to give samples have been found guilty beyond a reasonable doubt of serious crimes . . . . One result of their crimes is that society has a vastly increased interest in their identities. 'The Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as "legitimate." [Citation.]' [Citation.] 'By their commissions of a crime and subsequent convictions, persons such as appellant have forfeited any legitimate expectation of privacy in their identities. In short, any argument that Fourth Amendment privacy interests do not prohibit gathering information concerning identity from the person of one who has been convicted of a serious crime, or of retaining that information for crime enforcement purposes, is an argument that long ago was resolved in favor of the government.' [Citation.] The trial court did not err in refusing to suppress the DNA profile evidence." (*Adams, supra,* 115 Cal.App.4th at pp. 258–259.)

We agree with *King* and *Adams.* When the search and seizure challenged here took place, appellant was not a member of the general population— someone who is generally free to go about his or her business, unsubjected to governmental interference—but instead was imprisoned following his conviction for a serious offense. "[W]hile persons imprisoned for crime enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the circumscription or loss of many significant rights. [Citation.]" (*Hudson v. Palmer* (1984) 468 U.S. 517, 524 [82 L.Ed.2d 393, 104 S.Ct. 3194].) While we leave for another day issues concerning the collection of DNA samples from arrestees and others who either have not been convicted or who have completed their sentences, we hold that application of former section 290.2 to appellant did not violate his rights under the Fourth Amendment. Accordingly, the trial court properly denied his motion to suppress the DNA evidence.

## II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The findings under sections 667.61, subdivision (d)(1) and 667.71 are reversed. Sentence is vacated and the matter is remanded for further proceedings in accordance with the views expressed in this opinion. In all other respects, the judgment is affirmed.

Harris, J., and Cornell, J., concurred.

A petition for a rehearing was denied June 16, 2006, and appellant's petition for review by the Supreme Court was denied August 16, 2006, S144821. Baxter, J., did not participate therein. Kennard, J., and Werdegar, J., were of the opinion that the petition should be granted.

---

*See footnote, *ante*, page 1135.