[EDITORS' NOTE: TEXT NOT CERTIFIED FOR PUBLICATION APPEARS WITH GRAY BACKGROUND BELOW.]
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 561 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 562 
OPINION
Lorenzo Birotte was charged with rape, forcible oral copulation and forcible sodomy more than 10 years after the crimes were committed and more than one year after a report first identified him by name as a suspect based on deoxyribonucleic acid (DNA) testing. The statute of limitations for the crimes charged is ordinarily 10 years. (Pen. Code, §801.1, subd. (b).)[1] However, section 803, subdivision (g)(1) (section 803(g)(1)), permits a criminal complaint to be filed "within one year of the date on which the identity of the suspect is conclusively established by DNA testing" if certain conditions are met.
When is a suspect's identity "conclusively established by DNA testing" within the meaning of section 803(g)(1)? Based on the language of the statute itself, as well as the legislative history of Assembly Bill No. 1742 (1999-2000 Reg. Sess.), which added section 803(g)(1) to the Penal Code, the additional one-year limitations period does not begin at least until qualified laboratory personnel fully evaluate and verify the data generated by the initial, automated computer match between the DNA profile developed from a suspect's biological sample and the DNA profile developed from evidentiary sources, including biological materials left by perpetrators at *Page 563 
crime scenes or obtained from victim examinations. Indeed, although as a practical matter it may eliminate any limitations period for crimes to which section 803(g)(1) applies, a reasonable interpretation of the statutory language, viewed in context, suggests the additional one-year limitations period does not commence until a biological sample has been obtained with a sufficient chain of custody for the DNA profile developed from it to be admissible in evidence, that DNA profile has been matched to a DNA profile developed from crime scene evidence and statistical analyses have been completed that establish with sufficient certainty the suspect is the source of the evidentiary profile. Because the criminal complaint was filed in this matter within one year of even the earliest of those possible trigger dates, the trial court properly denied Birotte's motion to dismiss the charges as barred by the statute of limitations. Accordingly, the petition for a writ of mandate is denied.
 FACTS AND PROCEDURAL BACKGROUND
1. The Sexual Offenses
According to her testimony at Birotte's preliminary hearing on June 20, 2006, C.H., who did not have a telephone, was talking to her mother from a telephone booth during the early morning hours of August 8, 1995 when Birotte, whom she identified in court as her assailant, came up behind her, grabbed her around the neck and dragged her to his car. After she was forced into the front passenger seat, C.H. saw a large knife lying near the manual gearshift. Birotte locked the car doors, drove to a dark area, parked, put the passenger seat in a reclined position and raped C.H.[2]
Birotte drove C.H. back to the telephone booth and unlocked the car doors. C.H. ran from the car and then called her mother from a different telephone booth to tell her what had happened. C.H.'s mother called the police, who interviewed C.H. at her home. C.H. subsequently went to the hospital for an examination, including the preparation of a rape kit.
 2. The Identification of Birotte As a Suspect Through DNA Testing
a. The identification process generally
At the evidentiary hearing on Birotte's motion to dismiss, Linton von Beroldingen, a criminalist manager in the databank program at the California *Page 564 
Department of Justice, Jan Bashinski, Richmond DNA Laboratory (DOJ Lab), testified about the DNA testing process that identified Birotte as a suspect.
The DOJ Lab maintains a database of DNA profiles referred to as CODIS, an acronym for Combined DNA Index System. CODIS contains two categories of DNA profiles: "offender profiles"[3] and "forensic unknown profiles."
Offender profiles are developed from buccal swab samples or other biological samples collected from, among others, individuals convicted of certain felonies pursuant to the DNA and Forensic Identification Database and Data Bank Act of 1998 (DNA Data Bank Act) (§§ 295-300.3). Offender profiles typically identify numerical specifications for forms of genetic material at 13 or 15 loci[4] and are identified in CODIS by a number, not a name, to maintain privacy and to prevent misuse of the information. Personnel working for the CODIS unit of the DOJ Lab are responsible for developing the offender profiles from DNA samples and uploading those profiles into CODIS.
Forensic unknown profiles are developed from evidentiary sources — usually biological materials left by perpetrators at crime scenes or obtained from victim examinations — provided by law enforcement agencies to one of approximately 20 government forensic laboratories, including a casework laboratory within the DOJ Lab, [5] or private laboratories that provide the data to a government laboratory for uploading into CODIS. Because evidentiary *Page 565 
sources of DNA may have been subjected to environmental conditions that degrade the samples or may for other reasons have minimal amounts of DNA present, forensic unknown profiles may not have numerical specifications for forms of genetic material at all 13 or 15 loci as do offender profiles.
Generally, the CODIS unit performs a weekly, routine computer search that compares offender profiles to forensic unknown profiles. A match between an offender profile and forensic unknown profile of at least seven loci is considered a "candidate match"; and a match detail report is generated that lines up both profiles, identified at that point only by code numbers, for comparison. The candidate match is reported to the laboratory that submitted the forensic sample. Employing a utility within the computer software, the submitting laboratory can then designate the match as an "offender hit," which triggers a confirmation process by the CODIS unit. Once the confirmation process has been initiated, CODIS unit personnel retrieve the offender sample from storage and analyze it again to confirm the data initially uploaded into CODIS are correct. Personnel also retrieve the information card submitted with the offender sample, which contains identifying information, such as the offender's fingerprints and California state identification number.
After measures are taken to confirm the information card is accurate and the offender profile uploaded into CODIS is correct, the CODIS unit prepares a "hit notification" document. This document and supporting records are placed in a file that is then subject to a technical review, which includes reviewing the records of the DNA data analysis, and an administrative review to ensure, among other things, no clerical errors have been made that might lead to the identification of the wrong suspect.[6] Once those reviews have been completed, the hit notification document is forwarded to the laboratory that submitted the forensic unknown profile identifying by name the person whose offender profile matched it. The submitting laboratory is responsible for notifying the law enforcement agency of the suspect's identity.
According to von Beroldingen, the CODIS unit's job is completed after it has notified the submitting laboratory of the suspect's identity. However, in cases in which the submitting laboratory is the casework unit of the DOJ Lab, the casework unit reviews the CODIS unit file associated with the offender *Page 566 
match to verify it. The casework unit has more complete data about the forensic unknown profile than the CODIS unit. As von Beroldingen explained, "[The CODIS unit is] looking at an abstract of the data that [the casework unit has]. We're looking at sets of numbers. But the data that they have [are] electrophoretic in nature and it has more to it than that abstraction. And there are occasions on which that becomes important. In the simplest case evaluation of the electropherograms will lead to the same conclusion as evaluation of the comparison of the described alleles in a chart, but it's possible that that might not be the case."
Once the casework unit verifies the match, it generates a report that is sent to the law enforcement agency that provided the evidentiary material from which the forensic unknown profile was developed informing it of the offender match and the identity of the suspect. That report is also subject to a technical and an administrative review before it is considered complete.
b. The identification of Birotte
On April 17, 2003 Los Angeles Police Department Scientific Services Division (LAPD Lab) personnel screened items from C.H.'s rape kit and determined sperm was present on a vaginal swab that could be tested for DNA.[7] The LAPD Lab forwarded the testable sample to the casework unit of the DOJ Lab, which in a report dated June 11, 2003 stated a male DNA profile had been detected for the sperm extracted from the swab. On June 24, 2003 this forensic unknown profile was uploaded into CODIS.
On March 19, 2004 a DNA sample was collected from Birotte at the Los Angeles County Sheriff's Department after he had been convicted of rape and sexual battery in another case. On November 9, 2004 the DNA profile developed from Birotte's sample was uploaded into CODIS. On November 12, 2004 a candidate match was generated during the weekly computerized comparison of offender profiles to forensic unknown profiles: Thirteen loci from Birotte's offender profile, identified only by a number at that time, matched 13 loci from the forensic unknown profile created from the sperm found on the vaginal swab in C.H.'s rape kit.
In a hit notification report dated December 14, 2004 to the casework unit director, a criminalist with the CODIS unit identified Birotte by name as the *Page 567 
offender matched to the forensic unknown profile from C.H.'s rape kit. The report also noted there had been a match between Birotte and a different forensic unknown profile. (The sexual offense in the second matched case, involving the victim M.R., had occurred on Aug. 8, 2000.) The report stated, "A new reference sample from Lorenzo Birotte should be obtained and analyzed by the casework laboratory." The bottom of the report indicated the technical review had been completed on December 15, 2004 and the administrative review had been completed on December 17, 2004. According to von Beroldingen, the hit notification report was hand-delivered to the casework unit on December 17, 2004.
On December 23, 2004 casework unit criminalist Lillian Tugado sent an e-mail to Larry Blanton of the LAPD Lab informing him the forensic unknown profiles from C.H.'s and M.R.'s cases "hit to each other and also hit to offender Lorenzo Birotte. . . . [¶] To date, we have not received the hit report for [M.R.'s case], but this case is addressed in the hit report for [C.H.'s case]. We will issue a formal report once we receive this second hit report."
Blanton, who read Tugado's e-mail on December 27, 2004, issued a database hit notification dated December 27, 2004 identifying Birotte as the offender in C.H.'s case and stating, "This information may be acted upon immediately. A confirmation of this hit should be completed prior to trial. Cold hit protocol requires that a new reference sample be obtained from the convicted offender. Once this sample has been booked, please contact the Serology/DNA Unit . . . and request a Cold Hit confirmation." The notification prepared by Blanton identified December 27, 2004 as the date of notification by the Department of Justice.
Tugado prepared a "Supplemental Report" dated December 23, 2004 stating, "As previously reported, the short tandem repeat (STR) profiles for these two cases were submitted to the Combined DNA Index System (CODIS). A thirteen-locus match . . . was identified between these two case evidence profiles and felon Lorenzo Birotte. . . . See the attached reports DNH-1217-04 [the case number for C.H.] and DNH-1218-04 [the case number for M.R.], both dated December 14, 2004. [¶] A new reference sample from Lorenzo Birotte needs to be submitted to the BFS Jan Bashinski DNA Laboratory for confirmation." The bottom of the report indicates the technical and administrative reviews were both completed on December 30, 2004. The report was mailed to the Los Angeles Police Department on January 5, 2005. *Page 568 
In November 2005 a new DNA sample from Birotte was analyzed and matched to the forensic unknown profile generated from C.H.'s rape kit.
 3. The Criminal Complaint, Information and Amended Information
In late December 2005 Birotte was charged by criminal complaint with committing one count of forcible rape (§ 261, subd. (a)(2)), one count of forcible oral copulation (§ 288a, subd. (c)(2)) and one count of forcible sodomy (§ 286, subd. (c)(2)).[8] The complaint alleged Birotte had kidnapped C.H., which substantially increased the risk of harm, and had personally used a dangerous or deadly weapon in the commission of the offenses. The complaint further alleged the statute of limitations had been extended pursuant to former section 803, subdivision (h)(1) (current § 803(g)(1)).[9] An arrest warrant was issued on December 29, 2005.
Following the preliminary hearing, an information was filed on July 5, 2006 alleging the same counts as contained in the criminal complaint. Birotte pleaded not guilty and denied the special allegations. An amended information was filed on May 15, 2008 that alleged December 27, 2004 as the date Birotte's identity was conclusively established by DNA testing and stated the complaint had been filed within one year of that date. Birotte again pleaded not guilty and denied the special allegations.
 4. The Trial Court's Denial of Birotte's Motion to Dismiss
On September 9, 2005 Birotte filed a motion to dismiss the case as untimely filed. At the hearing on the motion Birotte argued his identity was *Page 569 
conclusively established by DNA testing when the hit notification report was generated on December 14, 2004 identifying him as the suspect by name. The People argued Birotte's identity was not conclusively established until December 30, 2004, after both the casework unit and the CODIS unit of the DOJ Lab had completed their investigation and reports, including the technical and administrative reviews, notwithstanding the LAPD Lab had been notified of Birotte's identity on December 23, 2004.[10]
The trial court denied the motion, finding the statute of limitations began to run on December 27, 2004: "That is the date that the Department of Justice sent a notification to the Los Angeles Police Department of a database hit identifying Mr. Birotte as a suspect in this case. . . . In my view that is the date on which the statute of limitations started to run as that is the day on which the Department of Justice lab finished all their evaluation, and, therefore, on that date, in my view that is the date that the identity of the suspect was conclusively established pursuant to Penal Code section 803(g)(1). I do concur with defense counsel . . . that there was no more analysis on Mr. Birotte's sample after the date of December [14, 2004]; . . . however, . . . after the date of December [14, 2004], there was both a technical and administrative review of Mr. Birotte's sample to check the sample against other suspects in the Department of Justice database. In my view the . . . technical and administrative review of the sample is part of the analysis in this case, and in my view the identity of the suspect was not conclusively established until after the technical and administrative reviews were completed in this case, which in my view happened on the date of December the 27th, 2004."[11]
5. The Instant Petition
On January 28, 2009, with trial scheduled to begin on January 30, 2009, Birotte petitioned this court for a writ of mandate directing the trial court to dismiss the charges against him. On January 29, 2009 we issued a stay of *Page 570 
proceedings and on February 11, 2009 an order to show cause why the requested relief should not be granted.
 DISCUSSION
Section 803(g)(1) provides, "Notwithstanding any other limitation of time described in this chapter, a criminal complaint may be filed within one year of the date on which the identity of the suspect is conclusively established by DNA testing, if both of the following conditions are met: [¶] (A) The crime is one that is described in subdivision (c) of Section 290. [¶] (B) The offense was committed prior to January 1, 2001, and biological evidence collected in connection with the offense is analyzed for DNA type no later than January 1, 2004, or the offense was committed on or after January 1, 2001, and biological evidence collected in connection with the offense is analyzed for DNA type no later than two years from the date of the offense."[12]
Birotte argues his identity as the perpetrator of the August 1995 sexual attack on C.H. was "conclusively established by DNA testing" on December 14, 2004, the date of the initial hit notification report from a CODIS unit criminalist to the casework unit director that identified Birotte by name as the offender matched to the forensic unknown profile from C.H.'s rape kit. According to Birotte, the additional technical and administrative reviews performed as part of the CODIS unit's protocols to verify the match or any analyses completed by the casework unit do not constitute DNA testing and, therefore, do not extend the trigger date for the running of the one-year limitations period.
The People, on the other hand, insist the initial December 14, 2004 match of Birotte's DNA to the forensic unknown profile from the rape kit did not conclusively establish Birotte's identity within the meaning of section 803(g)(1). They argue a suspect's identity is conclusively established by DNA testing only after qualified laboratory staff completely evaluate and review the data. At various times the People have asserted that review process was not completed until December 27, 2004, December 30, 2004 or January 5, 2005[13] and in this writ proceeding contend Birotte's identity was conclusively established on December 30, 2004 when the DOJ Lab completed its technical and administrative review of the final report regarding the case. *Page 571 
As we discuss in the following two parts, based on the language of section 803(g)(1) itself, as well as its legislative history, we agree with the People that, for test results to conclusively establish a suspect's identity, the initial, automated computer match must at least be evaluated and verified by trained criminalists following established laboratory protocols.[14]
Having resolved the issue presented by Birotte's petition, at least in its most limited form, we normally would not proceed further. Nonetheless, because of its potential significance for future cases — and recognizing the Legislature may want to reconsider the matter or clarify its intent — we also explain the term "conclusively established by DNA testing" within the meaning of section 803(g)(1) is reasonably construed to require much more than administrative and technical verification at the DOJ Lab — that is, to conclude the additional one-year limitations period does not begin until a biological sample has been obtained with a sufficient chain of custody for the DNA profile developed from it to be admissible in evidence, that DNA profile has been matched to a DNA profile developed from crime scene evidence and statistical analyses have been performed that verify the suspect is the source of the evidentiary profile.
 1. The Plain Language of Section 803(g)(1) Requires More Than an Initial Match or Positive Identification of a Suspect's DNA with Crime Scene Evidence
By requiring a suspect's identity be "conclusively established" by DNA testing, rather than there simply be a positive identification or match, *Page 572 
section 803(g)(1) creates a trigger event dependent on an exceedingly high level of certainty. Although the statute itself does not define the term "conclusively established," in other contexts it has been equated to "indisputable" or free of any doubt and held to require "uncontroverted and conclusive evidence." (See, e.g., Flatley v. Mauro (2006)39 Cal.4th 299, 320 [46 Cal.Rptr.3d 606, 139 P.3d 2] [discussing when evidence conclusively establishes that assertedly protected speech or petition activity was illegal as a matter of law for purpose of a special motion to strike under Code Civ. Proc., § 425.16]; Soukup v. Law Officesof Herbert Hafif (2006) 39 Cal.4th 260, 286 [46 Cal.Rptr.3d 638,139 P.3d 30] [if there is a genuine issue that turns on proper inferences to be drawn from indisputable facts, then the question of illegality within the meaning of Code Civ. Proc., § 425.18, subd. (h), is not conclusively established]; American Internat. Specialty Lines Ins. Co v.Continental Casualty Ins. Co. (2006) 142 Cal.App.4th 1342, 1370 [49 Cal.Rptr.3d 1] [reviewing case law discussing evidence required to extinguish insurer's duty to defend; "the insurer must `produce in courtundisputed extrinsic evidence which conclusively establishes that there is no potential for coverage'"].)
Giving the words actually used by the Legislature their plain and commonsense meaning, for test results to conclusively establish a suspect's identity, rather than merely indicate a positive identification, they must be based on more than raw data or tentative or preliminary conclusions. (See People v. Loeun (1997) 17 Cal.4th 1, 9 [69 Cal.Rptr.2d 776, 947 P.2d 1313] ["`[i]n interpreting statutes, we follow the Legislature's intent, as exhibited by the plain meaning of the actual words of the law . . .'"]; Murillo v. Fleetwood Enterprises, Inc.
(1998) 17 Cal.4th 985, 993 [73 Cal.Rptr.2d 682, 953 P.2d 858] [actual words of a statute cannot be ignored].) The CODIS unit performed the first level of analysis; the casework unit, with more complete data for the forensic unknown profile, performed the second level of analysis.[15]
The technical and administrative reviews by trained criminalists, *Page 573 
performed in accordance with established laboratory protocols at both levels of analysis, were an integral and necessary part of the process to conclusively establish Birotte's identity as the suspect in the C.H. sexual assault. As von Beroldingen testified, given the tremendous volume of biological samples processed by the CODIS unit, mistakes — including clerical mistakes with respect to the accuracy of underlying data — can be made. Reviews intended to prevent an erroneous identification with significant consequences for the wrongly accused are not only reasonable, but to be expected.
Birotte's argument the additional one-year limitations period begins with the generation of the initial hit notification and that anything done to confirm that information is investigation, not DNA testing, which should occur after the one-year period is triggered, puts an unduly restricted interpretation on the Legislature's use of the phrase "by DNA testing." Read in context, the phrase serves to identify the means of identification, that is by DNA testing, not, for example by analysis of fingerprints or some other method, not to circumscribe the procedures performed to "conclusively establish" the suspect's identity.
 2. The Legislative History of Former Section 803, Subdivision (h)(1) (now § 803(g)(1)) Supports the Conclusion the One-year Limitations Period Is Not Triggered by an Initial Match or "Link"
The legislative history of Assembly Bill No. 1742 (1999-2000 Reg. Sess.), which added section 803(g)(1) to the Penal Code, strongly supports the conclusion, based on the language of the statute itself, the Legislature intended that the one-year limitations period would not begin to run at least until all laboratory analyses, including technical and administrative reviews, are completed.[16] *Page 574 
Until 2001 the statute of limitations for many sexual offenses, including the crimes with which Birotte is charged, was six years. (In reWhite (2008) 163 Cal.App.4th 1576, 1579-1580 [79 Cal.Rptr.3d 195].) As originally introduced on January 10, 2000 by Assemblymember Lou Correa, Assembly Bill No. 1742 (1999-2000 Reg. Sess.) extended the limitations period for certain sexual offenses to eight years. The contents of that original bill were replaced by amendment on March 9, 2000, which eliminated the blanket two-year extension of the limitations period and instead created a new one-year limitations period for specified sexual offenses in instances in which DNA testing identified a suspect. The proposed new subdivision (h) of section 803 provided: "Notwithstanding any other limitation of time described in this chapter, prosecution for an offense described in subparagraph (A) of paragraph (2) of subdivision (a) of Section 290 may be commenced within one year of the date on which forensic deoxyribonucleic acid (DNA) testing that links a named suspect to the offense is completed by the laboratory testing the evidence." (Assem. Amend, to Assem. Bill No. 1742 (1999-2000 Reg. Sess.) Mar. 9, 2000, § 1, p. 7, italics omitted.)
Assemblymember Correa explained the amended bill was intended to address "`a number of problems with the collection and analysis of biological material from persons compelled to provide samples pursuant to the" DNA Data Bank Act and "an approximate two-year backlog of samples in [the Department of Justice's] possession that remain to be tested. . . . [¶] This bill is necessary to ensure that cases solved through the use of genetic profiling are not barred by the current six-year statute of limitations while the State of California is in the process of modernizing its crime laboratories. By creating a limited exception in the most serious sexual assault cases where the only means of identifying the perpetrator is through forensic DNA technology, it will enable law enforcement to take full advantage of this powerful new tool. AB 1742 will ensure that we solve the most heinous of crimes while maintaining the balance between vigorous enforcement and the traditional policy reasons underlying the statute of limitations.'" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 1742 (1999-2000 Reg. Sess.) as introduced, pp. 2-3 [proposed amendment in committee].)
The Senate Public Safety Committee report for a June 27, 2000 hearing on the amended bill described the backlog problem as involving both the maintenance of the offender database and the processing of rape kits to populate the forensic unknown profile database. At that time the backlog of rape kits exceeded 10,000. (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1742 (1999-2000 Reg. Sess.) as amended Mar. 9, 2000, p. 8.) The *Page 575 
report also raised several concerns about the amended bill as then drafted: "This bill may inadvertently remove the general imperative imposed by statutes of limitations for the quick and timely prosecution of sex offenses. As now drafted, this bill essentially would allow the commencement of sex offense prosecutions to float until the date a DNA test links a named suspect to an offense. [¶] Although intended to ensure that sex crime prosecutions are not precluded by the lapse of an arbitrary limitations period, by attaching the limitations period to the date of a DNA test, this bill would remove a powerful incentive for swift and intensive crime investigations — the limitations period. In fact, in one of the cases used as an example to support this bill, DNA testing finally occurred nearly seven years after a sex crime was committed, and only when law enforcement, pressed by the crime survivor, believed the statute of limitations was about to expire." (Id. at p. 9.) On the other hand, the report noted, "Some proponents submit that, as a matter of public policy, the sex offenses covered by [the bill] constitute the type of very serious offense that warrants prosecution without any time limitations," as is the case for murder and aggravated forms of kidnapping. (Id. at p. 7.)
The report also posed a number of questions for consideration, including whether law enforcement should "be required to routinely test rape kits within the limitations period" and whether, "if the DNA evidence testing backlog is expected to be current within two years, is this bill necessary." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1742, supra, at pp. 10-11, capitalization omitted.) The report also proposed, "[a]s an alternative to the `floating' limitations period proposed by this bill, the author and/or the Committee may wish to consider extending the period to eight or ten years." (Id. at p. 12.)[17]
Assembly Bill No. 1742 (1999-2000 Reg. Sess.) was again amended on July 6, 2000, shortly after the Senate Public Safety Committee hearing. Changes included extending the statute of limitations for certain sexual offenses generally to 10 years and, most significantly for our analysis, substituting for the original language "within one year of the date on which forensic deoxyribonucleic acid (DNA) testing that links a named suspect to the offense is completed by the laboratory testing the evidence" the language now found in section 803(g)(1), "within one year of the date on which the *Page 576 
identity of the suspect is conclusively established by DNA testing." The July 6, 2000 amendments also added the requirements now found in section 803(g)(1)(A) and (B) regarding the timely processing of crime scene forensic evidence. (Sen. Amend, to Assem. Bill No. 1742 (1999-2000 Reg. Sess.) July 6, 2000, § 1.) The bill was passed by the Senate on August 10, 2000 and by the Assembly on August 18, 2000. The Governor signed the legislation on August 24, 2000.
As discussed, standing alone the Legislature's use of the term "conclusively established by DNA testing" necessarily requires something more than a positive identification or initial match of a suspect's DNA with crime scene evidence. That conclusion as to the Legislature's intent is strongly reinforced by the provision originally requiring only that the named suspect be "link[ed]" to the offense. In response to criticism, as reflected in the Senate Public Safety Committee report, including that the bill failed to define what "links" a suspect by DNA testing or when testing is "completed," the trigger date for the one-year window was changed to after "the identity of the suspect is conclusively established by DNA testing," a standard clearly intended to be more stringent than simply a link (or a match) to the suspect by DNA testing.
 3. Additional Analyses That May Be Required to Conclusively Establish a Suspect's Identity by DNA Testing
Because the criminal complaint charging Birotte with rape and other sexual assaults was filed within one year of the date the DOJ Lab completed its technical and administrative reviews of the final report identifying him as a suspect, we need not resolve whether that date or some later one triggers section 803(g)(1)'s one-year limitations period. Having considered the issue, however, we believe it appropriate to identify the bases for a more expansive interpretation of the statute.
a. Chain of custody
As discussed, one of the criticisms of Assembly Bill No. 1742 (1999-2000 Reg. Sess.) as amended March 9, 2000, which proposed a new one-year limitations period for specified sexual offenses triggered by the laboratory's completion of DNA testing that "links" a named suspect to the offense was that it created chain of custody issues. (See Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1742, supra, at p. 14; see also ante, fn. 15.) In *Page 577 
response to this and other criticism, the trigger event was changed to "the identity of the suspect is conclusively established by DNA testing." If the test results are not admissible in evidence, however, they would not seem, by any reasonable interpretation of the language used, to "conclusively establish" the suspect's identity.
In addition to evaluation and verification of the computer-generated match itself, therefore, section 803(g)(1) appears to require the DNA testing data be based on a sample obtained from the suspect with a sufficient chain of custody to permit the People to lay a proper foundation for the evidence: "`"The burden on the party offering the evidence is to show to the satisfaction of the trial court that, taking all the circumstances into account including the ease or difficulty with which the particular evidence could have been altered, it is reasonably certain that there was no alteration. [¶] The requirement of reasonable certainty is not met when some vital link in the chain of possession is not accounted for, because then it is as likely as not that the evidence analyzed was not the evidence originally received. Left to such speculation the court must exclude the evidence."'" (People v. Wallace
(2008) 44 Cal.4th 1032, 1061 [81 Cal.Rptr.3d 651].)
At the hearing on Birotte's motion to dismiss, DOJ Lab criminalist manager von Beroldingen testified the initial DNA sample from which the offender DNA profile is created and uploaded into CODIS is not collected from an individual arrested for, or convicted of, one of the specified sex offenses in a manner that would ensure the results are admissible at trial.[18] As a result, after the hit notification report has been generated, a new sample is collected from the person identified and that sample is maintained under controls that ensure a chain of custody can be proved at trial. This new sample is then analyzed by the same laboratory that generated the forensic unknown profile, a process that not only serves to establish a proper chain of custody but also creates an independent verification by a different laboratory from the CODIS unit that initially generated the offender profile. *Page 578 
Consistent with this testimony and the DOJ Lab policies, the December 14, 2004 initial hit notification report, the December 23, 2004 supplemental report prepared by Tugado and the hit notification prepared by Blanton on December 27, 2004 all stated a new reference sample would have to be collected from Birotte and analyzed. That sample was not collected until late 2005, and the DNA testing of this sample apparently occurred only a few weeks before the criminal complaint was filed.
b. Statistical analyses
Collection of a DNA sample utilizing procedures that ensure a proper chain of custody and matching the DNA profile developed from that sample to the forensic unknown profile, however, may still not produce evidence that conclusively establishes the suspect's identity by DNA testing. Approximately two years before former section 803, subdivision (h)(1) (current § 803(g)(1)) was enacted, in People v. Venegas (1998)18 Cal.4th 47 [74 Cal.Rptr.2d 262, 954 P.2d 525], the Supreme Court considered a number of complex questions concerning the admissibility of DNA evidence and addressed the need for statistical probability calculations in addition to the mere matching of DNA profiles: "A determination that the DNA profile of an evidentiary sample matches the profile of a suspect establishes that the two profiles are consistent, but the determination would be of little significance if the evidentiary profile also matched that of many or most other human beings. The evidentiary weight of the match with the suspect is therefore inversely dependent upon the statistical probability of a similar match with the profile of a person drawn at random from the relevant population." (Id. at p. 82; see People v. Johnson (2006) 139 Cal.App.4th 1135, 1147 [43 Cal.Rptr.3d 587], fn. omitted ["[W]hile the fact of a match itself is relevant because it means the suspect could be the perpetrator, the probability that he is the perpetrator depends on the frequency with which the genetic profile appears in the population of possible perpetrators, i.e., the rarity of the perpetrator's profile in the population. [Citation.] The rarer the genetic profile, the more likely the suspect is the source of the evidentiary sample."].)[19] *Page 579 
We need not delve any more deeply into the complex statistical issues considered in People v. Venegas, supra, 18 Cal.4th 47 and People v.Soto, supra, 21 Cal.4th 512 or the more recent case of People v. Nelson,supra, 43 Cal.4th 1242 addressing the use of statistical analysis in "cold hit" cases. (See, e.g., Nelson, at p. 1266 ["`the picture is more complicated when the defendant has been located through a database search . . .'"].) Rather, it is enough to note at the time former section 803, subdivision (h)(1) (now § 803(g)(1)) was initially adopted, it was well established by controlling case law that evidence of a DNA match, while perhaps relevant, could not be considered as conclusively establishing the identity of the defendant (or suspect) absent evidence of the statistical probability of a similar match with the profile of a person drawn at random from the relevant population. No such statistical analyses confirming it was highly unlikely anyone other than Birotte was the source of the forensic unknown profile occurred in this case before the criminal complaint was filed.
 4. The Concern for Possible Prosecutorial Manipulation of the Limitations Period
The People acknowledged at oral argument that matching a DNA profile obtained from a suspect to the forensic unknown profile utilizing procedures that ensure a proper chain of custody for the DNA samples frequently does not occur until the suspect has been charged with the crime. Similarly, appropriate statistical analyses that confirm the suspect is the source of the forensic unknown profile are often performed only after the filing of the criminal complaint, close to the date of trial. Thus, as Birotte argues, to interpret the term "conclusively established by DNA testing" to require the completion of technical and administrative reviews at both the CODIS and the casework units of the DOJ Lab, let alone construing that term to also require chain of custody matching and statistical analyses, creates what is essentially a floating trigger for the one-year limitations period and provides the People with a largely unfettered ability to delay prosecution of sexual offenders.
The concerns Birotte articulates are legitimate. The same concerns, however, were articulated in the Senate Public Safety Committee report. Yet the Legislature enacted former section 803, subdivision (h)(1), and, in fact, addressed some of the criticism by including the condition that the forensic *Page 580 
DNA analysis must be completed within specified periods. (See § 803(g)(1)(A), (B).) Indeed, the Legislature rejected the solution proposed in the report of simply extending the statute of limitations to 10 years without any one-year window exception for DNA identification of perpetrators, instead opting to both extend the six-year statute of limitations to 10 years[20] and include a one-year window triggered by the suspect's conclusive identification by DNA testing. The Legislature thus appears to have made an explicit choice, giving primary significance to the goal of ensuring heinous sex crimes are prosecuted notwithstanding the risk that prosecution could be substantially delayed. To the extent a future Legislature believes it proper to revisit that decision or to amend section 803(g)(1) to make it clear a more restricted construction of "conclusively established by DNA testing" is preferred, it can revise the statutory language to accomplish that result. (See In re Summer H.
(2006) 139 Cal.App.4th 1315, 1334 [43 Cal.Rptr.3d 682]; Lopez v.Tulare Joint Union High School Dist. (1995) 34 Cal.App.4th 1302,1333-1334 [40 Cal.Rptr.2d 762].)
Until the statutory language is changed, we are bound to interpret it according to its plain meaning, as reinforced by the legislative history we have discussed. In adopting a broad construction of section 803(g)(1), albeit not as broad as the language and legislative history suggest, however, we need not rely solely on the good faith of law enforcement personnel and public prosecutors to ensure the completion date of DNA testing is not improperly manipulated in sexual offense cases. The power of the People to delay prosecution is not entirely without limit. A due process challenge is always available to contest an unjustified delay that impermissibly prejudices a criminal defendant. (See People v. Nelson, supra, 43 Cal.4th at p. 1250 ["`right of due process protects a criminal defendant's interest in fair adjudication by preventing unjustified delays that weaken the defense through the dimming of memories, the death or disappearance of witnesses, and the loss or destruction of material physical evidence'"]; see also Scherling v.Superior Court (1978) 22 Cal.3d 493, 507 [149 Cal.Rptr. 597, 585 P.2d 219] ["The ultimate inquiry in determining a claim based upon due process is whether the defendant will be denied a fair trial. If such deprivation results from unjustified delay by the prosecution coupled with prejudice, it makes no difference whether the delay was deliberately designed to disadvantage the defendant, or whether it was caused by negligence of law enforcement agencies or the prosecution. In both situations, the defendant will be denied his right to a fair trial as a result of government conduct."].) *Page 581 
 DISPOSITION
The petition is denied. The stay of proceedings issued on January 29, 2009 is vacated.
Jackson, J., concurred.
[1] Penal Code section 801.1, subdivision (b), states, "[P]rosecution for a felony offense described in subdivision (c) of Section 290[, including rape, forcible oral copulation and forcible sodomy,] shall be commenced within 10 years after commission of the offense."
Statutory references are to the Penal Code unless otherwise indicated.
[2] When she testified at the preliminary hearing, C.H. did not recall having been orally and rectally penetrated by Birotte. However, she reported these additional offenses to the police officers who came to her home immediately after the incident.
[3] Although von Beroldingen referred to these profiles as "convicted offender profiles," all persons arrested for certain felonies are required to provide DNA samples (§ 296.1), not just those convicted of the specified offenses.
[4] In People v. Nelson (2008) 43 Cal.4th 1242, 1258 [78 Cal.Rptr.3d 69,185 P.3d 49] the Supreme Court summarized forensic DNA analysis: "`With the exception of red blood cells, every cell in the human body has a nucleus containing the person's genetic code in the form of DNA. . . . DNA consists of two parallel spiral sides, a double helix, composed of repeated sequences of phosphate and sugar. The sides are connected by a series of rungs, with each rung consisting of a pair of chemical components called bases. . . . There are four types of bases — adenine (A), cytosine (C), guanine (G), and thymine (T). A will pair only with T, and C will pair only with G. . . . There are over three billion base pairs in a person's DNA. . . . [¶] Except for identical twins, no two persons have identical DNA. . . . This makes DNA valuable for forensic purposes. However, there is no practical way of sequencing all three billion base pairs. . . . Accordingly, forensic scientists test particular regions called loci that are known to be polymorphic, i.e., variable from person to person. . . . Scientists have identified loci where a particular pattern of base pairs is repeated successively for numbers of times that vary from person to person. . . . These repetitions are referred to as alleles. . . . These alleles can be measured and compared to determine whether a suspect sample matches an evidentiary biological sample at each of the loci tested. . . .'"
[5] The casework laboratory is physically separated from the portion of the DOJ Lab responsible for processing offender samples and maintaining CODIS. Offender samples are never taken to the casework laboratory, and forensic unknown samples are never taken to the area that processes offender samples. For clarity, the casework laboratory within the DOJ Lab will be referred to as the "casework unit" and the portion of the DOJ Lab responsible for processing offender samples and maintaining CODIS as the "CODIS unit." Von Beroldingen is a manager with the CODIS unit.
[6] Von Beroldingen explained how clerical errors can occur: "[W]e have well over a million samples in the front door. And the collection process requires human data entry by writing things on forms. And there are a number of ways in which errors can be made when you are carrying out that kind of work. That work is performed in the field. It is not directly under our supervision. We conduct training. We explain how it is supposed to be done, but we don't supervise it obviously."
[7] For section 803(g)(1)'s extended one-year limitations period to be available, DNA collected in connection with offenses committed prior to January 1, 2001 had to be analyzed for DNA type no later than January 1, 2004. (§ 803(g)(1)(B).)
[8] There is some disagreement concerning the date on which the criminal complaint was filed. All counsel in the trial court and the court itself believed the complaint was filed on Friday, December 23, 2005, the typed date on the document. The superior court computerized docket indicates the complaint was not filed until December 29, 2005. In their return to the petition for writ of mandate, however, the People contend the complaint was filed on December 27, 2005 and have submitted a file-stamped, conformed copy of the complaint to support that position. In this court Birotte refers to both the December 23, 2005 and December 27, 2005 dates. These differences are not material to our analysis of the timeliness of the commencement of the prosecution.
[9] Senate Bill No. 111 (2005-2006 Reg. Sess.) rewrote former section 803, subdivisions (f) and (g) as new subdivision (f) and redesignated former section 803, subdivision (h), as section 803, subdivision (g), effective January 1, 2006. (See Stats. 2005, ch. 479, § 3.) Senate Bill No. 172 (2007-2008 Reg. Sess.) changed the cross-reference in section 803(g)(1)(A) to the sexual offenses identified in section 290, subdivision (c), rather than the now obsolete former reference to section 290, subdivision (a)(2)(A). (See Stats. 2007, ch. 579, § 41.) The substance of current section 803(g)(1) insofar as it permits commencement of a prosecution for specified sexual offenses within "one year of the date on which the identity of the suspect is conclusively established by DNA testing" has remained unchanged since it was enacted in 2000. (See Stats. 2000, ch. 235, § 1.)
[10] Consistent with the allegations in the amended information, the People had originally argued in their opposition to Birotte's motion to dismiss that the one-year limitations period began to run on December 27, 2004 when the LAPD Lab "formally learned of the Cold Hit Notification which permitted them to move on with [the] investigation." In a supplemental letter brief in the trial court, the People modified their position, contending the limitations period began running on December 30, 2004, in accord with von Beroldingen's testimony technical and administrative reviews are part of the DOJ Lab's protocols to verify whether a match is conclusive and those were not completed in this case until that date.
[11] In fact, the Department of Justice sent its notification to the Los Angeles Police Department on December 23, 2004, although the e-mail was not read by Blanton until December 27, 2004. The technical and administrative reviews were not completed until December 30, 2004, which is the date indicated on the supplemental report prepared by Tugado.
[12] Section 803, subdivision (g)(2), provides, "For purposes of this section, `DNA' means deoxyribonucleic acid."
[13] January 5, 2005 is the date Tugado's supplemental report, following the technical and administrative reviews, was mailed to the Los Angeles Police Department.
[14] In interpreting section 803(g)(1) we are, of course, guided by well-established principles of statutory construction. Our fundamental task is to ascertain the Legislature's intent and thereby effectuate the purpose of the statute. (Olson v. Automobile Club of Southern California
(2008) 42 Cal.4th 1142, 1147 [74 Cal.Rptr.3d 81, 179 P.3d 882]; Smithv. Superior Court (2006) 39 Cal.4th 77, 83 [45 Cal.Rptr.3d 394,137 P.3d 218].) "We begin with the statutory language because it is generally the most reliable indication of legislative intent." (Miklosyv. Regents of University of California (2008) 44 Cal.4th 876, 888 [80 Cal.Rptr.3d 690, 188 P.3d 629].) "If there is no ambiguity, then we presume the lawmakers meant what they said, and the plain meaning of the language governs." (Day v. City of Fontana (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; see also Smith, at p. 83.) "If, however, the statutory terms are ambiguous, then we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history. [Citation.] In such circumstances, we `"select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences."'" (Day, at p. 272.) "[W]e do not construe statutes in isolation, but rather read every statute `with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.'" (People v. Pieters (1991)52 Cal.3d 894, 899 [276 Cal.Rptr. 918, 802 P.2d 420]; see also StoneStreet Capital, LLC v. California State Lottery Com. (2008)165 Cal.App.4th 109, 118 [80 Cal.Rptr.3d 326] ["[w]e presume that the Legislature, when enacting a statute, was aware of existing related laws and intended to maintain a consistent body of rules"].)
[15] With respect to procedures performed by the laboratory submitting the forensic unknown profile that is tasked with notifying the law enforcement agency of the suspect's identity, von Beroldingen only testified about the casework unit's protocol, which requires issuance of a report that is technically and administratively reviewed before notifying the law enforcement agency of the suspect's identity. In cases where another government laboratory or a private laboratory — all of which must meet state and federal requirements, including the Federal Bureau of Investigation quality assurance standards and be accredited by an organization approved by the NDIS (National DNA Index System) Procedures Board (§ 297) — submits the forensic sample, it is completion of that laboratory's established protocol that will determine the date the statute of limitations commences. What that date is will be a question of fact in any given case. Although ordinarily we would expect the law enforcement agency not to be notified before the submitting laboratory fully completes its procedures, as this case demonstrates, premature notification can take place.
[16] Review of legislative materials is appropriate in this case whether we deem the undefined term "conclusively established by DNA testing" to be ambiguous or consider it clear and unambiguous. (Compare, e.g., Smith v. Superior Court, supra, 39 Cal.4th at p. 83 [if the statutory terms are ambiguous, court may review the legislative history to choose the construction that comports most closely with the Legislature's apparent intent] and Day v. City of Fontana, supra,25 Cal.4th at p. 272 [if statutory language is ambiguous, "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history"] with, e.g., California School Employees Assn.v. Governing Board (1994) 8 Cal.4th 333, 340 [33 Cal.Rptr.2d 109,878 P.2d 1321] ["Ordinarily, if the statutory language is clear and unambiguous, there is no need for judicial construction. [Citation.] Nonetheless, a court may determine whether the literal meaning of a statute comports with its purpose."] and In re Tobacco II Cases (2009)46 Cal.4th 298, 316 [93 Cal.Rptr.3d 559, 207 P.3d 20] ["even though recourse to extrinsic material is unnecessary given plain language of statute, we may consult it for material that buttresses our construction of the statutory language"].)
[17] The American Civil Liberties Union, which opposed the legislation, also expressed a number of objections summarized in the Senate Public Safety Committee report, including the bill "is vague. It does not define what `links' a suspect by DNA testing, and does not define when DNA testing is `completed.' [¶] The reliability of DNA testing raises due process issues, raising testing standards; lab oversight; chain of custody and evidence storage; and related issues." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 1742, supra, at p. 14.)
[18] Von Beroldingen explained, "[The] offender sample collection is essentially an administrative process and is pursuant to Penal Code statute, but it is not carried out in the same way that evidence collection is typically carried out. And although records are made of sample collection and submission to our laboratory and processing by our laboratory that allow us to know which sample is which and to track samples, still there is not a record maintained of the same nature as the chain of custody that is made for a piece of evidence collected by a law enforcement officer in the course of his or her duties. Consequently, because the Department of Justice is not present at the collection of offender samples and because those activities are carried on by numerous elements of law enforcement and corrections in California, we don't have the same chain of custody that pertains when an officer actually observes the collection of a reference sample for DNA analysis from an individual and then transports or causes the transportation of that sample under chain of custody to a laboratory where it will be analyzed and the results of that analysis are clearly best suited for presentation in court."
[19] As described by the Supreme Court several years later in Peoplev. Soto (1999) 21 Cal.4th 512 [88 Cal.Rptr.2d 34, 981 P.2d 958], theVenegas court "found general scientific acceptance of the modified ceiling principle . . . as a forensically reliable method of calculating the statistical probabilities of a match between the evidentiary samples and the DNA of an unrelated person chosen at random from the general population," but left open the question "whether evidence of statistical probabilities calculated using the unmodified product rule is admissible at trial in a criminal case to assist the trier of fact in assessing the probative significance of a DNA match." (Soto, at p. 515, fn. omitted.) The court in Soto answered that question and held such evidence is admissible. (Ibid. ["the unmodified product rule, as applied in DNA forensic analysis, is generally accepted in the relevant scientific community of population geneticists, and that statistical calculations made utilizing the rule meet the Kelly test for admissibility"].)
[20] After several reenactments without textual change the 10-year statute of limitations is now codified in section 801.1, subdivision (b). (See In re White, supra, 163 Cal.App.4th at p. 1580.)